Slip Op. 12 - 137

UNITED STATES COURT OF INTERNATIONAL TRADE

```
CAMAU FROZEN SEAFOOD
PROCESSING IMPORT EXPORT
CORPORATION, et al.,

     Plaintiffs,

          v.

UNITED STATES,

     Defendant,

          and

AD HOC SHRIMP TRADE ACTION
COMMITTEE and AMERICAN SHRIMP
PROCESSORS ASSOCIATION,

     Defendant-Intervenors.
```

Before: Donald C. Pogue,
        Chief Judge

Consol. Court No. 11-00399[1]

OPINION

[affirming, in part, and remanding, in part, final results of
administrative review of antidumping duty order]

Dated: November 15, 2012

        Matthew R. Nicely, David S. Christy, and David J.
Townsend, Thompson Hine LLP, of Washington, DC, on behalf of
Plaintiffs Camau Frozen Seafood Processing Import Export Corp.;
Minh Phu Seafood Corp.; Minh Phat Seafood Co., Ltd.; Minh Qui
Seafood Co., Ltd.; and Viet I-Mei Frozen Foods Co., Ltd.

        Joshua E. Kurland, Trial Attorney, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, DC, on behalf of Defendant.  With him on the briefs
were Stuart F. Delery, Acting Assistant Attorney General; Jeanne
E. Davidson, Director; and Patricia M. McCarthy, Assistant
Director.  Of counsel on the briefs was Jonathan Zielinski,
Senior Attorney, Office of the Chief Counsel for Import
Administration, U.S. Department of Commerce, of Washington, DC.

---

[1] This action is consolidated with Court No. 11-00383.
Order, Dec. 20, 2011, ECF No. 30.

        Andrew W. Kentz, Jordan C. Kahn, and Nathaniel M.
Rickard, Picard Kentz & Rowe LLP, of Washington, DC, for the
Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

        Terence P. Steward, Geert M. De Prest, Elizabeth J.
Drake, Jumana M. Misleh, and Stephanie R. Manaker, Stewart and
Stewart, of Washington, DC, and Edward T. Hayes, Leake &
Andersson, LLP, of New Orleans, LA, for the Defendant-Intervenor
American Shrimp Processors Association.

        **Pogue, Chief Judge**: This is a consolidated action

seeking review of determinations made by the United States

Department of Commerce ("Commerce") in the fifth administrative

review of the antidumping duty order covering certain frozen

warmwater shrimp from the Socialist Republic of Vietnam

("Vietnam").[2]  Currently before the court are motions for

judgment on the agency record submitted by Respondents Camau

Frozen Seafood Processing Import Export Corp., *et al.*,

(collectively "Respondents") and Petitioner Ad Hoc Shrimp Trade

Action Committee ("AHSTAC").  Respondents challenge Commerce's

decision to zero in this administrative review after it ceased

zeroing in investigations; AHSTAC challenges Commerce's choice of

Bangladesh as the primary surrogate country and Commerce's

decision to value labor using only data from the Bangladesh

---

        [2] Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam, 76 Fed. Reg. 56,158 (Dep't Commerce Sept.
12, 2011) (final results and final partial rescission of
antidumping duty administrative review) ("Final Results"), and
accompanying Issues & Decision Memorandum, A-552-802, ARP 09-10
(Aug. 31, 2011), Admin. R. Pt. 2 Pub. Doc. 9, available at
http://ia.ita.doc.gov/frn/summary/VIETNAM/2011-23278-1.pdf (last
visited Nov. 13, 2012) ("I & D Mem.") (adopted in Final Results,
76 Fed. Reg. at 56,159).

Bureau of Statistics.

As explained below, the court (1) affirms Commerce's explanation for continuing to zero in reviews but not in investigations; (2) does not reach Commerce's choice of Bangladesh as the primary surrogate country; and (3) remands Commerce's decision to value labor using only data from the Bangladesh Bureau of Statistics.

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006)[3] and 28 U.S.C. § 1581(c) (2006).

## BACKGROUND

Commerce has designated Vietnam as a non-market economy country ("NME"). When investigating potentially dumped merchandise from an NME, Commerce considers the NME data for measuring normal value[4] to be unreliable. Therefore, Commerce calculates normal value for merchandise from an NME using surrogate values for factors of production drawn from a market economy country. 19 U.S.C. § 1677b(c)(1). In general, Commerce

---

[3] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition.

[4] An antidumping duty equal to "the amount by which the normal value exceeds the export price" may be assessed on merchandise sold at less than fair value in the United States. 19 U.S.C. § 1673.

prefers to draw all surrogate values from a single surrogate country (the "primary surrogate country"). Import Administration Policy Bulletin No. 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004), <u>available at</u> http://ia.ita.doc.gov/policy/bull04-1.html (last visited Nov. 15, 2012) ("Policy Bulletin 04.1"). In this review, Commerce chose Bangladesh as the primary surrogate country and rejected AHSTAC's preferred choice, the Philippines. <u>I & D Mem.</u> cmt. 1 at 3-5.

In the past, Commerce has deviated from its general surrogate value policy when choosing surrogate values for labor. Rather than drawing surrogate labor values from the primary surrogate country, Commerce historically valued labor by averaging labor values from multiple countries. While this review was pending, Commerce changed its policy to value labor solely on the basis of data from the primary surrogate country. <u>Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor</u>, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) ("<u>New Labor Methodology</u>"). In light of its new policy, Commerce sought additional comments from interested parties on how to value labor in the instant review. <u>I & D Mem.</u> at 2. After reviewing the comments, Commerce chose to value labor consistent with the <u>New Labor Methodology</u> by using data solely from the primary surrogate country, Bangladesh. <u>Id.</u> at cmt. 2.I at 21-24.

Furthermore, when calculating the weighted average dumping margin in this review, Commerce chose to zero dumping margins with negative values. Id. at cmt. 3 at 32.[5] At the time of this review, Commerce's practice of zeroing in administrative reviews differed from its practice of offsetting in antidumping investigations, where it allowed dumping margins with negative and positive values to offset each other when calculating the weighted average dumping margin. Id. at 30-32.[6] However, in February of this year, Commerce published a new policy regarding the use of zeroing in administrative reviews. Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8101 (Feb. 14, 2012) ("Final Modification"). In the Final Modification, Commerce stated that

---

[5] This issue has been the subject of much recent litigation, and further background on the issue and its development can be found in Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT __, 853 F. Supp. 2d 1352 (2012) ("Grobest II") and Union Steel v. United States, 36 CIT __, 823 F. Supp. 2d 1346 (2012).

[6] See also Grobest II, 36 CIT at __, 853 F. Supp. 2d at 1360-61 ("Pursuant to both methodologies, Commerce calculates the § 1677(35)(A) dumping margin by subtracting the export price from normal value for each averaging group [of subject merchandise]. Once a dumping margin has been established, Commerce aggregates these dumping margins to determine a weighted average dumping margin. In an investigation, Commerce aggregates all of the dumping margins to determine 'overall pricing behavior.' In a review, Commerce zeros negative margins prior to aggregation to arrive at a more accurate margin and to uncover masked dumping." (citation omitted)).

> the Department is adopting the proposed changes to its
> methodology for calculating weighted-average margins of
> dumping and antidumping duty assessment rates to
> provide offsets for non-dumped comparisons when using
> monthly [average-to-average] comparisons in reviews, in
> a manner that parallels the WTO-consistent methodology
> the Department currently applies in original
> antidumping duty investigations.

Id. at 8102.  Therefore, as of April 16, 2012, Commerce ceased

zeroing, in general, consistent with the policy announced in the

Final Modification.


## STANDARD OF REVIEW

When reviewing Commerce's decisions in administrative

reviews of antidumping duty orders, the Court "shall hold

unlawful any determination, finding, or conclusion found . . . to

be unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).


## DISCUSSION

I.   Zeroing

Turning first to the issue of zeroing, Respondents

challenge Commerce's decision to employ zeroing in administrative

reviews but not in investigations.  But the explanation Commerce

provided in this review is the same as that previously held to be

both reasonable and consistent with the Court of Appeals for the

Federal Circuit's decisions in <u>Dongbu Steel Co. v. United States</u>, 635 F.3d 1363 (Fed. Cir. 2011) and <u>JTEKT Corp. v. United States</u>, 642 F.3d 1378 (Fed. Cir. 2011). <u>See</u> <u>Grobest II</u>, 36 CIT at __, 853 F. Supp. 2d at 1356-62; <u>see also</u> <u>Far E. New Century Corp. v. United States</u>, 36 CIT __, Slip Op. 12-110, *6-7 (Aug. 29, 2012). In <u>Grobest II</u>, the court found the relevant statute ambiguous and Commerce's rationale for employing differing methodologies in investigations and reviews to be a reasonable interpretation of the statute. <u>Grobest II</u>, 36 CIT at __, 853 F. Supp. 2d at 1358-62.

Respondents also raise an issue in this case that was not decided in <u>Grobest II</u>. Specifically, Respondents challenge Commerce's reliance on the goal of identifying masked dumping as a basis for Commerce's continued use of zeroing in administrative reviews. Respondents argue that it is inappropriate for Commerce to rely on this rationale in light of Commerce's new policy of not zeroing in administrative reviews.[7] Mem. of Law Supp. Pls.'

---

[7] In <u>Grobest II</u>, the defendant-intervenors raised this issue in their comments to the court on Commerce's remand results. Because the issue had not been raised in comments to Commerce on the Department's draft remand results, the court found that defendant-intervenors had failed to exhaust their administrative remedies and declined to consider the argument. <u>Grobest II</u>, 36 CIT at __, 853 F. Supp. 2d at 1361 n.10. Here, while Respondents have not previously raised this argument before Commerce, they had no opportunity because the new policy was published on February 12, 2012, following the publication, on September 12, 2011, of the <u>Final Results</u>. Therefore, the exhaustion doctrine does not apply in this case.

Rule 56.2 Mot. J. Agency R. at 15, ECF No. 40 ("Resp'ts' Br.").

        Respondents focus on language in the Final Modification
where Commerce states that "the Department disagrees with those
comments that suggest it is not capturing 100 percent of the
dumping" and that "the Department does not agree that the
potential for masked dumping means that [average-to-average]
comparisons are unsuitable as the default basis for determining
the weighted-average dumping margins . . . in reviews." Final
Modification, 77 Fed. Reg. at 8106, 8104; Resp'ts' Br. at 15-16.[8]
Taken together, Respondents argue, these statements show that
Commerce concedes it can capture 100 percent of dumping without
zeroing; therefore, masked dumping is not a reasonable concern
that can support alternative methodologies in investigations and
reviews.

        Respondents, however, do not recognize the full extent
of Commerce's reasoning in the Final Modification.  First,
Commerce does not argue that it can capture 100 percent of
dumping with its new average-to-average offsetting methodology
for reviews; rather, Commerce argues that it "will capture 100
percent of the dumping *that is determined to exist pursuant to*

_____

        [8] Respondents also argue that the methodology announced in
the Final Modification is arbitrary and unreasonable because
Commerce reserves the right to apply an alternative methodology
when it believes such is appropriate. Resp'ts' Br. at 15-16.  But
Commerce's application in future cases is not at issue in this
case.

*this methodology*." Final Modification, 77 Fed. Reg. at 8106 (emphasis added).   Furthermore, Commerce has not abandoned its concern about masked dumping.   On the contrary, Commerce has changed its approach to masked dumping by deciding to pursue masked dumping on a case-by-case basis. Id. at 8104 ("Similar to the conduct of original investigations, when conducting reviews under the modified methodology, the Department will determine, on a case-by-case basis, whether it is appropriate to use an alternative comparison methodology . . . .").

When examined in full, Commerce's reasoning in the Final Modification does not indict the rationale behind its prior policy of zeroing in reviews but not in investigations.   Commerce has made a change in policy and priority.   The new policy announced in the Final Modification responds to a series of adverse World Trade Organization ("WTO") decisions finding that Commerce's zeroing methodology in reviews was inconsistent with the General Agreement on Tariffs and Trade ("GATT") and the Agreement on Implementation of Article VI of the GATT 1994. Id. at 8101-02.   To adhere to these adverse findings, Commerce, pursuant to 19 U.S.C. § 3533(g), changed its policy.   When Commerce stated that the new policy would "capture 100 percent of the dumping that is determined to exist pursuant to this methodology," Final Modification, 77 Fed. Reg. at 8106, it was acknowledging that some dumping could go uncaptured.   While

Commerce remains concerned about masked dumping, and will pursue
it on a case-by-case basis, Commerce adopted a new methodology
that may capture less masked dumping in order to conform with
adverse WTO rulings.

This new policy does not undermine Commerce's rationale
for the prior policy.  Commerce remains concerned about masked
dumping but has determined it cannot pursue its prior approach to
masked dumping and conform to the adverse WTO rulings.  Going
forward, Commerce has chosen to pursue the latter objective over
the former.  This change in objective does not make the prior
policy unreasonable, just as Commerce previously "adjust[ed] its
methodology to seek overall pricing behavior in investigations
and more accurate duties in reviews, by zeroing in reviews but
not in investigations," without being unreasonable, Grobest II,
36 CIT at __, 853 F. Supp. 2d at 1361–62.

For the foregoing reasons, the court will follow its
recent opinions in Grobest II and Far E. New Century on the issue
of zeroing and affirm Commerce's explanation as reasonable.

II.  Surrogate Country Choice

In its first of two challenges, AHSTAC contends that
Commerce improperly selected Bangladesh as the primary surrogate
country.  Specifically, AHSTAC challenges Commerce's policy of
considering all countries designated economically comparable to
the NME under investigation to be *equally* economically

comparable.  AHSTAC, however, did not raise this issue before

Commerce, even though the issue was clearly in play and AHSTAC

had an opportunity to raise its challenge during the

administrative review.  Therefore, the court will not reach this

issue because AHSTAC failed to exhaust its administrative

remedies.

In actions challenging antidumping determinations, "the

Court of International Trade shall, where appropriate, require

the exhaustion of administrative remedies." 28 U.S.C. § 2637(d).

Exhaustion is "generally appropriate in the antidumping context

because it allows the agency to apply its expertise, rectify

administrative mistakes, and compile a record adequate for

judicial review — advancing the twin purposes of protecting

administrative agency authority and promoting judicial

efficiency." Carpenter Tech. Corp. v. United States, 30 CIT 1595,

1597, 464 F. Supp. 2d 1347, 1349 (2006) (quoting Carpenter Tech.

Corp. v. United States, 30 CIT 1373, 1374-75, 452 F. Supp. 2d

1344, 1346 (2006)).  For these reasons, parties are "procedurally

required to raise the[ir] issue before Commerce at the time

Commerce [is] addressing the issue." Dorbest Ltd. v. United

States, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (alteration in

original) (citing Mittal Steel Point Lisas Ltd. v. United States,

548 F.3d 1375, 1383 (Fed. Cir. 2008)).

In its case brief to Commerce, AHSTAC argued that the

Philippines should be the surrogate country solely because its surrogate value data was superior to the Bangladeshi data. AHSTAC Case Br., A-522-802, ARP 09-10 (Apr. 18, 2011), Admin. R. Pt. 1 Pub. Doc. 166 at 1–11.  Commerce was not persuaded and selected Bangladesh as the primary surrogate.  At no point did AHSTAC contend that the difference in GNI between Bangladesh and the Philippines (or the difference between either potential surrogate country and Vietnam) was relevant to the surrogate country selection.  In other words, AHSTAC never argued that one country was more economically comparable to Vietnam than the other.

The issue of economic comparability became important for AHSTAC when Commerce decided to apply its New Labor Methodology in this administrative review because this meant Commerce would value labor using data from the primary surrogate country, Bangladesh, rather than using multi-country averaging or data from AHSTAC's preferred source, the Philippines. Nevertheless, when Commerce invited comments on the application of the New Labor Methodology in this review, Letter from Commerce to Interested Parties, A-552-802, ARP 09-10 (June 23, 2011), Admin. R. Pt. 1 Pub. Doc. 173 ("Labor Letter"), AHSTAC did not challenge Commerce's finding of equal economic comparability between Bangladesh and the Philippines in light of the New Labor Methodology, see Producers Comments on Labor Rates, A-552-802, ARP 09-10 (July 7, 2011), Admin. R. Pt. 1 Pub. Doc. 175

("AHSTAC's Labor Methodology Comments").  AHSTAC chose to argue

instead that Commerce should either 1) maintain its multi-country

averaging approach because it was consistent with prior Court of

International Trade case law, 2) choose the Philippines as the

surrogate country because the ILO Chapter 6A data Commerce said

it preferred in the New Labor Methodology was available from the

Philippines but not Bangladesh, or 3) value labor alone based on

data from the Philippines because ILO Chapter 6A data was

available and the Bangladeshi Bureau of Statistics data on wage

rates was unreliable. AHSTAC's Labor Methodology Comments at 2-9.

    AHSTAC contends that exhaustion is not appropriate

because Commerce notified the parties that it intended to apply

the New Labor Methodology after the period for submission of

administrative case briefs had ended and requested narrowly

tailored comments within a short (two week) time frame. Pl. Ad

Hoc Shrimp Trade Action Comm.'s Reply Mem. at 12-13, ECF No. 72

("AHSTAC's Reply Br.").  In AHSTAC's view these procedures were

so exceptional and onerous that the court should exercise its

discretion to consider AHSTAC's argument. Cf. Hormel v.

Helvering, 312 U.S. 552, 557 (1941) ("There may always be

exceptional cases or particular circumstances which will prompt a

reviewing or appellate court, where injustice might otherwise

result, to consider questions of law which were neither pressed

nor passed upon by the court or administrative agency below.").

The court recognizes that such cases may exist, but this is not one.  Though the period for additional comment may have been short and the subject matter narrow, AHSTAC had ample notice of the New Labor Methodology and a fair opportunity to raise its concern about the presumption of equal economic comparability.  But AHSTAC never raised its economic comparability argument before Commerce.[9]  By not raising the argument, AHSTAC deprived Commerce of the opportunity to "apply its expertise, rectify administrative mistakes, [or] compile a record adequate for judicial review" on the issue. Carpenter Tech., 30 CIT at 1597, 464 F. Supp. 2d at 1349.

By not raising the equal economic comparability argument before Commerce, AHSTAC failed to exhaust its administrative remedies with respect to this issue. See QVD Food Co. v. United States, 34 CIT __, 721 F. Supp. 2d 1311, 1320–21 (2010) (finding a failure to exhaust administrative remedies

---

[9] In its comments on valuing labor in this review, AHSTAC did challenge the choice of Bangladesh as the primary surrogate country and argued that Commerce should reconsider that decision and choose the Philippines on the basis of the superior Philippine data. AHSTAC's Labor Methodology Comments at 4–5. This challenge to primary surrogate country choice is no more germane to the "narrow issue of the Department's final labor rate pursuant to [the New Labor Methodology]," AHSTAC's Reply Br. at 12–13 (quoting Labor Letter at 2) (emphasis omitted), than an argument challenging the economic comparability policy would have been.  Having argued surrogate country choice in its comments, AHSTAC's argument that it did not have an opportunity to comment on economic comparability because the request for comment was so narrowly tailored is not persuasive.

where a party introduced, in its brief to the court, new arguments not made before Commerce even though issues were "squarely in play"), aff'd, 658 F.3d 1318 (Fed. Cir. 2011). Accordingly, the court does not reach Commerce's choice of Bangladesh as the primary surrogate country.

## III. Surrogate Labor Methodology

AHSTAC also challenges Commerce's decision to rely solely on data from Bangladesh to value labor.  AHSTAC contends both that the Bangladeshi labor rate is unsupported by substantial evidence and that Commerce failed to adequately explain its decision to change from a policy of valuing labor using multi-country averaging to valuing labor based on data solely from the primary surrogate country.[10]  As the latter is a facial challenge to Commerce's new policy, it will be addressed first.

When valuing factors of production, Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).  Prior to the

---

[10] AHSTAC also challenges the Bangladeshi labor data as aberrationally low.  As discussed below, Commerce's choice of the Bangladeshi data will be remanded because it is not supported by substantial evidence; therefore, the court need not reach the question of whether the Bangladeshi data is aberrational.

Court of Appeals' decision in Dorbest Ltd. v. United States, 604
F.3d 1363 (Fed. Cir. 2010) ("Dorbest IV"), Commerce valued labor
using a regression based methodology described in 19 C.F.R.
§ 351.408(c)(3). Id. at 1367-68.  In Dorbest IV, the Court of
Appeals invalidated the regression based methodology, holding
that § 351.408(c)(3) "improperly requires using data from both
economically comparable and economically dissimilar countries,
and it improperly uses data from both countries that produce
comparable merchandise and countries that do not." Id. at 1372.

     In response to Dorbest IV, Commerce established an
interim methodology that relied on a simple average of labor
rates from economically comparable countries that were also
significant producers of comparable merchandise. Dorbest Ltd. v.
United States, 35 CIT __, 755 F. Supp. 2d 1291, 1294-96 (2011)
("Dorbest VI"); see also Antidumping Methodologies in Proceedings
Involving Non-Market Economies: Valuing the Factor of Production:
Labor; Request for Comment, 76 Fed. Reg. 9544, 9546-47 (Dep't
Commerce Feb. 18, 2011) ("Request for Comment").  Commerce's
interim methodology was subsequently upheld by this Court on
several occasions. See Grobest & I-Mei Indus. (Vietnam) Co. v.
United States, 36 CIT __, 815 F. Supp. 2d 1342, 1356-60 (2012)
("Grobest I"); Home Products Int'l, Inc. v. United States, 36 CIT
__, 810 F. Supp. 2d 1373, 1377-78 (2012); Shandong Rongxin Imp. &
Exp. Co. v. United States, 35 CIT __, 774 F. Supp. 2d 1307, 1314

(2011).  While affirming multi-country averaging, <u>Shandong</u> also narrowed the universe of countries available for Commerce to average by holding that "Commerce's interpretation of 'significant' encompasses countries which almost certainly have no domestic production — at least not any meaningful production, capable of having influence or effect — and is therefore an impermissible construction of [the 'significant producer' test in] 19 U.S.C. § 1677b(c)(4)." <u>Shandong</u>, 35 CIT at __, 774 F. Supp. 2d at 1316.

Following the <u>Request for Comment</u>, Commerce published its <u>New Labor Methodology</u>, where it decided that in light of the diminished sample size for averaging occasioned by <u>Dorbest IV</u> and <u>Shandong</u>, it would value labor solely based on data from the primary surrogate country. <u>New Labor Methodology</u>, 76 Fed. Reg. at 36,093.  Commerce applied the <u>New Labor Methodology</u> in this review based on the same analysis, <u>I & D Mem.</u> cmt. 2.I at 23–24, which AHSTAC now challenges.

But changes in administrative policy are not subject to heightened review. <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 514 (2009).  In other words, the agency is not required to explain why a new policy is better than the old policy; it is enough that the policy would have been justified if adopted new. <u>Id.</u> at 514–15.  Thus, it is sufficient for the new policy to reasonably fill a statutory gap left for agency decision making.

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467

U.S. 837, 843-44 (1984).

        Commerce premises its change in policy, in both the

I & D Mem. and the New Labor Methodology, on the diminished

efficacy of multi-country averaging after Dorbest IV and

Shandong:

> [T]he Department concluded that to be compliant with
> the statute, and the two most recent court decisions,
> the base for an average wage calculation would be so
> limited (two countries in this case following the
> interim labor methodology) that there would be little,
> if any, benefit to relying on an average of wages from
> multiple countries for purposes of minimizing the
> variability that occurs in wages across countries.

I & D Mem. cmt. 2.I at 24; see also New Labor Methodology, 76

Fed. Reg. at 36,093.  Acknowledging its past policy and

addressing the problem that led it to reject multi-country

averaging provides a reasonable basis for Commerce's policy

change. Cf. Fox Television, 556 U.S. at 515.  In light of Dorbest

IV and Shandong, Commerce cannot find enough countries that are

both economically comparable and significant producers of subject

merchandise to effectively average wages from multiple countries.

Thus, Commerce has provided a reasonable basis for abandoning its

prior policy, and the new policy is reasonable on its face.

        That Commerce's decision to change policy may be

facially reasonable does not fully resolve the issue presented

here.  Commerce's decision in this review, to value labor based

solely on Bangladeshi data, must also be supported by substantial

evidence.   Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477

(1951) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229

(1938)).   And the "substantiality of evidence must take into

account whatever in the record fairly detracts from its weight."

<u>Id.</u> at 488.

        In considering whether to value labor solely on the

basis of data from Bangladesh, Commerce did not reconsider its

prior findings that wage rates strongly correlate to GNI and,

therefore, require special consideration.   As Commerce stated

when it promulgated 19 C.F.R. § 351.408:

> [W]hile per capita GDP and wages are positively
> correlated, there is great variation in the wage rates
> of the market economy countries that the Department
> typically treats as being economically comparable.   As
> a practical matter, this means that the result of an
> NME case can vary widely depending on which of the
> economically comparable countries is selected as the
> surrogate. . . . By avoiding the variability in results
> depending on which economically comparable country
> happens to be selected as the surrogate, the results
> are much fairer to all parties.

<u>Antidumping Duties; Countervailing Duties</u>, 61 Fed. Reg. 7308,

7345 (Dep't Commerce Feb. 27, 1996) (proposed rules).[11]   In light

---

[11] <u>See also</u> <u>Request for Comment</u>, 76 Fed. Reg. at 9545
("[W]age data from a single surrogate country does not normally
constitute the best available information for purposes of valuing
the labor input due to the variability that exists across wages
from countries with similar GNI."); <u>Certain Frozen Warmwater
Shrimp from the People's Republic of Vietnam</u>, 75 Fed. Reg. 47,771
                                        (footnote continued)

of Commerce's prior findings, the facts on the record of this

case seem to highlight the very concerns about valuing labor on

the basis of a single surrogate country that Commerce has

repeatedly raised.   Specifically, taking into account the three

factors Commerce considers in choosing surrogate countries —

economic comparability, significant production of comparable

merchandise, and quality of data — Commerce had the following

points of comparison on the record of this case[12]:

---

[11](footnote continued)
(Dep't Commerce Aug. 9, 2010) (final results and partial
rescission of antidumping duty administrative review) and
accompanying Issues and Decision Memorandum, A-552-802, ARP 08-09
(July 30, 2010) cmt. 9 at 27 ("[W]age data from a single
surrogate country does not constitute the best available
information for purposes of valuing the labor input due to the
variability that exists between wages and GNI. . . . As a result,
we find reliance on wage data from a single surrogate country to
be unreliable and arbitrary.").

[12] The following table includes the two countries that
Commerce determined satisfied all three criteria on the record of
this case.   For the Preliminary Results of this review Commerce
employed its interim labor methodology. Certain Frozen Warmwater
Shrimp from the Socialist Republic of Vietnam, 76 Fed. Reg.
12,054, 12,062-63 (Dep't Commerce Mar. 4, 2011) (preliminary
results, partial rescission, and request for revocation, in part,
of the fifth administrative review) ("Preliminary Results").
Based on GNI, measured in per capita U.S. Dollars, Commerce found
thirty-five countries, falling between Bangladesh at the low end
and Indonesia at the high end, to be economically comparable to
Vietnam. Surrogate Values for the Preliminary Results, A-552-802,
ARP 09-10 (Feb. 28, 2011), Admin. R. Pt. 1 Pub. Doc. 144 at 6
("Surrogate Value Mem.").   Of these thirty-five economically
comparable countries, Commerce determined that eighteen were also
significant producers of comparable merchandise, using its pre-
Shandong criteria for significant producers. Id.  Of these
eighteen countries, three reported industry specific data under
Chapter 5B of the ILO dataset: Egypt, the Philippines, and
                                        (footnote continued)

|  | GNI (per capita USD) | Labor Rate (USD/hour) |
|---|---|---|
| Philippines | 1890 | 1.91 |
| Vietnam | 890 | -- |
| Bangladesh | 520 | 0.21 |

---

[12](footnote continued)
Indonesia. Id. at 7-8.  If the Department's preference for
industry specific data, as reported in ILO Chapter 6A or a
comparable form, see New Labor Methodology, 76 Fed. Reg. at
36,093-94, is taken into account, then Indonesia is removed from
the list.  Finally,  Egypt exported $39,251 of subject
merchandise in 2007 and had no reported exports in 2008 or 2009,
Ex. 6 to the Surrogate Value Mem.; therefore, it arguably fails
the Shandong significant producer test and should be removed.
        AHSTAC also introduced ILO 6A data and argued that
Guyana (GNI 1450/0.82 USD/hour), Nicaragua (GNI 1080/1.02
USD/hour), and India (GNI 1070/0.70 USD/hour) met the
economically comparable and significant producer tests.
Producers' Rebuttal Factual Info., A-552-802, ARP 09-10 (July 15,
2011), Admin. R. Pt. 1 Pub. Doc. 180, at 3.  Because Commerce
valued labor based on data from the primary surrogate country,
Bangladesh, there is no record in the Final Results or I & D Mem.
of whether Commerce considered the alternate AHSTAC values to
have met all the necessary prongs for consideration; nor,
therefore, is there a record decision for the court to review.
        The data in this table is drawn from the following
sources.  GNI data is drawn from Request for Comments on
Surrogate Country Selection, A-552-802, ARP 09-10 (Aug. 20,
2010), Admin. R. Pt. 1 Pub. Doc. 82A, attach. 1.  Labor rate data
for the Philippines is drawn from Ex. 6 to the Surrogate Value
Mem.  Labor rate data for Bangladesh is drawn from the Final
Surrogate Value Mem., which states that the Bangladeshi labor
rate for the relevant period was 14.55 Bangladeshi Takas per
hour. Ex. 1 to the Final Surrogate Value Mem., A-552-802, ARP
09-10 (Aug. 31, 2011), Admin. R. Pt. 2 Pub. Doc. 3A.  The average
exchange rate for Bangladeshi Takas to U.S. Dollars during the
first half of 2009, the period for which the Bangladeshi labor
rate was calculated, was 1.45%, as calculated by averaging the
daily buy rate of U.S. Dollars in Bangladeshi Takas provided by
Bangladesh Bank, the Central Bank of Bangladesh, from January 1,
2009, to June 30, 2009.  See Bangladesh Bank, Exchange Rates,
http://www.bb.org.bd/econdata/exchangerate.php (use drop down
menus under "search previous data from archive" to retrieve daily
historical exchange rates with the U.S. Dollar) (last visited
Nov. 14, 2012).  Converting 14.55 Bangladeshi Takas at a rate of
1.45% results in a labor rate of $0.210975 or $0.21 per hour.

        The data in this table places the Department's prior

arguments regarding disparate wage rates across countries

presumed to be equally economically comparable into sharp relief.

Insofar as Commerce considers both countries in this table to be

economically comparable to Vietnam, the record suggests that

choosing one country to value labor may introduce either

overstated or understated labor rates.  Commerce obliquely

acknowledges this fact when it fails to address AHSTAC's

contention that wage rate variability is correlated to GNI

variability.  Commerce notes in the I & D Mem. that

> [t]he Department has long recognized, and the
> Petitioners also agree, that the disparity in labor
> rates correspond with disparities in the GNIs of
> countries.  The Petitioners' labor data does not
> demonstrate that the Bangladeshi labor data is
> aberrationally low, but speak to the Petitioners'
> argument that the Department's wage rate policy
> establishes a practice whereby labor wage rates will be
> understated when the surrogate country has a low GNI
> and overstated when the GNI is high.

I & D Mem. cmt. 2.I at 24.

        Commerce has acknowledged both the correlation of wage

rates to GNI and AHSTAC's concerns about the resulting

possibility for outlying labor values in this review, yet

Commerce did not address the disparity in the GNI of potential

surrogate countries on the record of this case.  The Philippines

has a GNI roughly twice that of Vietnam, and Bangladesh has a GNI

roughly half that of Vietnam.  Furthermore, this disparity in GNI

is reflected in a disparity between the wage rates of the two

countries.

Commerce's conclusion that Bangladesh's wage rate is the best available information for valuing the wage rate in Vietnam must be based on a reasonable reading of the entire record.[13]  By accounting for neither its prior finding of a correlation between wage rates and GNI nor the disparity in both wage rates and GNIs of the proposed surrogate countries on the record of this case, Commerce has not considered evidence that fairly detracts from the weight of its conclusion. Universal Camera, 340 U.S. at 488.

Therefore, Commerce's use of Bangladeshi data to value labor is not supported by substantial evidence.  Commerce may change its averaging methodology, but it must make data choices that a reasonable mind could find to be the best available on the record.  In light of its prior findings regarding the exceptional nature of the labor factor of production, Commerce should reconsider what factors are important when valuing labor in this

---

[13] Commerce argues that the Bangladeshi data is the best available information for valuing labor because Commerce has a policy that favors valuing all factors of production using a single surrogate country.  Commerce has previously found, however, that labor should be treated differently for the reasons discussed above.  Without addressing these prior findings and the apparent discrepancy in labor values on the record of this case, Commerce's policy of preferring a single surrogate country does not satisfy the substantial evidence test.

At oral argument, counsel for the Government offered alternative bases for choosing Bangladesh, including its relative proximity in GNI to Vietnam; however, counsel's arguments were not made by Commerce on the record of this case.

Consol. Court No. 11-00399                                Page 24

review.  For the foregoing reasons, Commerce's decision to value

labor only on the basis of data from Bangladesh will be remanded

for reconsideration or further explanation.


**CONCLUSION**

Consistent with the foregoing opinion, the <u>Final</u>

<u>Results</u> are affirmed, in part, and remanded, in part.  Commerce's

explanation for its continued use of zeroing in administrative

reviews is affirmed.  Commerce's decision to value labor solely

on the basis of data from Bangladesh is remanded.  On remand,

Commerce must either reconsider whether, on the facts presented

here, it is reasonable to value labor using only data from the

primary surrogate country or provide further explanation for its

decision.  In either case, Commerce's decision must be supported

by substantial evidence on the record.

Commerce shall have until January 14, 2013, to complete

and file its remand redetermination.  Plaintiffs and Defendant-

Intervenors shall have until January 28, 2013, to file comments.

Plaintiffs, Defendant, and Defendant-Intervenors shall have until

February 11, 2013, to file any reply.

It is **SO ORDERED**.


                                   /s/ Donald C. Pogue
                                  Donald C. Pogue, Chief Judge

Dated: November 15, 2012
       New York, New York