UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE DONALD C. POGUE, CHIEF JUDGE

—————————————————————————
                                                          )
CAMAU FROZEN SEAFOOD PROCESSING          )
IMPORT EXPORT CORPORATION, *et al.*,            )
                                                          )
                  Plaintiffs,                             )
                                                          )
        v.                                              )
                                                          )
UNITED STATES,                                        )          Consol. Court No. 11-00399
                                                          )
                  Defendant,                             )
                                                          )
        and                                             )
                                                          )
AD HOC SHRIMP TRADE ACTION                 )
COMMITTEE and AMERICAN SHRIMP             )
PROCESSORS ASSOCIATION,                      )
                                                          )
                  Defendant-Intervenors.               )
—————————————————————————)

## <u>ORDER</u>

Upon consideration of the remand results filed by the Department of Commerce pursuant

to *Camau Frozen Seafood Processing Import & Export Corp. v. United States*, 880 F. Supp. 2d

1348 (Ct. Int'l Trade 2012), plaintiff's comments on the remand results, defendant's response

thereto, and all other pertinent papers, it is hereby

        ORDERED that the remand results are sustained in their entirety; and it is further

        ORDERED that judgment is entered for the United States.


                                        ————————————————————
                                                  CHIEF JUDGE


Dated: ————————————, 2013
        New York, N.Y.

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE DONALD C. POGUE, CHIEF JUDGE

_____
                                                    )
CAMAU FROZEN SEAFOOD PROCESSING          )
IMPORT EXPORT CORPORATION, *et al.*,         )
                                                    )
                Plaintiffs,                         )
                                                    )
        v.                                          )
                                                    )
UNITED STATES,                                 )        Court No. 11-00399
                                                    )
                Defendant,                          )
                                                    )
        and                                         )
                                                    )
AD HOC SHRIMP TRADE ACTION              )
COMMITTEE and AMERICAN SHRIMP          )
PROCESSORS ASSOCIATION,                    )
                                                    )
                Defendant-Intervenors.               )
_____)

---

DEFENDANT'S RESPONSE COMMENTS REGARDING REMAND RESULTS

---

                                    STUART F. DELERY
                                    Principal Deputy Assistant Attorney General

                                    JEANNE E. DAVIDSON
                                    Director

OF COUNSEL:                         PATRICIA M. McCARTHY
                                    Assistant Director

MYKHAYLO A. GRYZLOV                 JOSHUA E. KURLAND
Senior Attorney                     Trial Attorney
Office of the Chief Counsel         Department of Justice, Civil Division
    for Import Administration       Commercial Litigation Branch
U.S. Department of Commerce         P.O. Box 480
                                    Ben Franklin Station
                                    Washington, DC 20044
                                    Tel:  (202) 616-0477
                                    Fax:  (202) 307-0972
                                    Email:  Joshua.E.Kurland&usdoj.gov

July 18, 2013                       Attorneys for Defendant United States

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

BACKGROUND ...................................................................................................... 3

    I.     The Court's Remand Order .............................................................................. 3

    II.    Commerce's Remand Redetermination ........................................................... 4

ARGUMENT ........................................................................................................... 7

    I.     Standard Of Review ........................................................................................ 7

    II.    Commerce Properly Determined That Data From The Primary Surrogate
         Country, Bangladesh, Is The Best Available Information For Valuing Labor ........ 8

         A.    Commerce Properly Addressed The Findings That Prompted Its Prior
               Labor Methodology ................................................................................. 9

         B.    Commerce Properly Addressed The Record Evidence And The
               Court's Concerns Regarding The Difference In Wage Rates Between
               Bangladesh And The Philippines ............................................................ 16

    III.   AHSTAC Has Failed To Demonstrate That The Bangladeshi Data Are
         Aberrant ........................................................................................................ 19

CONCLUSION ........................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Anderson v U.S. Secretary of Agriculture*,
    30 CIT 1742 (Ct. Int'l Trade 2006) ................................................ 13

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ................................................ 8

*Camau Frozen Seafood Processing Imp. & Export Corp. v. United States*,
    880 F. Supp. 2d 1348 (Ct. Int'l Trade 2012) ................................................ *passim*

*Clearon Corp. and Occidental Chem. Corp. v. United States*,
    No. 08-0364, 2013 Ct. Int'l Trade LEXIS 27 (Ct. Int'l Trade Feb. 20, 2013) ................ 6, 10

*Consol. Edison Co. of N.Y., Inc. v. Abraham*,
    314 F.3d 1299 (Fed. Cir. 2002) ................................................ 13

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ................................................ 7

*Consol. Int'l Automotive v. United States*,
    809 F. Supp. 125 (Ct. Int'l Trade 1992) ................................................ 20

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ................................................ 8, 16

*Dorbest ltd. v. United States*,
    604 F.3d 1363 (Fed. Cir. 2010) ................................................ 5, 24

*Mittal Steel Galati S.A. v. United States*,
    502 F. Supp. 2d 1295 (Ct. Int'l Trade 2007) ................................................ 23, 24

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ................................................ 8

*Pakfood Public Co. Ltd. v. United States*,
    753 F. Supp. 2d 1334 (Ct. Int'l Trade 2011) ................................................ 13

*Peer Bearing Co-Changshan v. United States*,
    804 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) ................................................ *passim*

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    774 F. Supp. 2d 1307 (Ct. Int'l Trade 2011) ................................................ 5, 6

*SKF USA, Inc. v. United States,*
   630 F.3d 1365 (Fed. Cir. 2011) ......................................................... 13

*Thai I-Mei Foods Co. v. United States,*
   616 F.3d 1300 (Fed. Cir. 2010) ......................................................... 25

*U.S. Ass'n of Imps. of Textiles & Apparel v. United States,*
   413 F.3d 1344 (Fed. Cir. 2005) ......................................................... 20

*United States Steel Corp. v. United States,*
   712 F. Supp. 2d 1330 (Ct. Int'l Trade 2010).......................................... 20

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) ....................................................................... 7

*United States v. Udy,*
   381 F.2d 455 (10th Cir. 1967) ........................................................... 14

*Xinjiamei Furniture (Zhangzhou) Co., Ltd v. United States,*
   No. 11-0456, 2013 Ct. Int'l Trade LEXIS 34 (Ct. Int'l Trade Mar. 11, 2013).......... 24

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................. 7

19 U.S.C. § 1677b(c)(1)(B) ............................................................... 19

19 U.S.C. § 1677b(c)(4)............................................................... 4, 11

## ADMINISTRATIVE DETERMINATIONS

*Antidumping Methodologies in Proceedings Involving Non-Market Economies:*
*Valuing The Factor of Production:  Labor,*
   76 Fed. Reg. 36,092 (Dep't of Commerce June 21, 2011) .................................... 3, 19

*Certain Frozen Warmwater Shrimp from the People's Republic of China,*
   77 Fed. Reg. 53,856 (Dep't of Commerce Sept. 4, 2012).................................... 22, 23

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam,*
   75 Fed. Reg. 47,771 (Dep't of Commerce August 9, 2010) ..................................... 18

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam,*
   76 Fed. Reg. 56,158 (Dep't of Commerce Sept. 12, 2011)..................................... 3

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE DONALD C. POGUE, CHIEF JUDGE

_____
                                                                    )
CAMAU FROZEN SEAFOOD PROCESSING          )
IMPORT EXPORT CORPORATION, *et al.*,              )
                                                                    )
                    Plaintiffs,                                )
                                                                    )
          v.                                                       )
                                                                    )
UNITED STATES,                                           )          Consol. Court No. 11-00399
                                                                    )
                    Defendant,                               )
                                                                    )
          and                                                    )
                                                                    )
AD HOC SHRIMP TRADE ACTION               )
COMMITTEE and AMERICAN SHRIMP        )
PROCESSORS ASSOCIATION,                        )
                                                                    )
                    Defendant-Intervenors.               )
_____)

## DEFENDANT'S RESPONSE COMMENTS REGARDING REMAND RESULTS

Defendant, the United States, respectfully submits this response to the comments filed by

consolidated plaintiff, Ad Hoc Shrimp Trade Action Committee (AHSTAC), on the results of the

remand redetermination that the Department of Commerce (Commerce) conducted following this

Court's decision in *Camau Frozen Seafood Processing Import & Export Corp. v. United States*,

880 F. Supp. 2d 1348 (Ct. Int'l Trade 2012) (*Camau I*).   The Court in *Camau I* concluded that

Commerce's current methodology for valuing labor, based solely on data from the primary

surrogate country, Bangladesh, is reasonable on its face.  *Id.* at 1358.  The Court remanded the

labor wage rate issue, however, for Commerce to address its prior findings, made when

Commerce had relied upon a prior wage-rate methodology, that wage rates require special

consideration because they strongly correlate to *per capita* gross national income (GNI), as well as to address the disparity in labor rates between Bangladesh and the Philippines.  *Id.* at 1361.

The Court should affirm Commerce's remand results because they are consistent with the remand order, supported by substantial evidence, and are otherwise in accordance with law. Commerce thoroughly explained why, on the facts presented here, it is reasonable to value labor using only data from the primary surrogate country, Bangladesh.   In doing so, consistent with the Court's remand order, Commerce directly addressed its prior findings and the difference in the surrogate labor data between Bangladesh and the Philippines.  Commerce specifically explained why, given the changes that affected Commerce's ability to smooth out variation in labor wage rates through averaging, the advantages in terms of accuracy and uniformity of valuing labor using data from the primary surrogate country outweigh the marginal benefits (if any) of averaging.  Commerce also explained why the difference between the Bangladeshi and Filipino data does not alter Commerce's reasonable determination that the Bangladeshi data constitute the best available information for valuing labor because the two data sets stem from different industrial categories, and hence different levels of aggregation.

AHSTAC's efforts to undermine Commerce's determination in its comments on the remand results evidence disagreement with Commerce's weighing of the record evidence, rather than a lack of reasonableness.  AHSTAC's comments also evidence a false assumption that deriving a labor wage rate between those of Bangladesh and the Philippines would inherently be "better" than relying on Bangladeshi data, when there is little support for such a proposition and Commerce has articulated sound reasons for preferring to value labor and other factors of production using data from a single primary surrogate country.  Thus, Commerce's remand results should be sustained.

**BACKGROUND**

**I.      The Court's Remand Order**

In the final results of the fifth administrative review of certain frozen warmwater shrimp

from Vietnam, Commerce relied upon its new labor methodology to select a surrogate value for

labor using data from the primary surrogate country for the review, Bangladesh. *See Certain*

*Frozen Warmwater Shrimp from the Socialist Republic of* Vietnam, 76 Fed. Reg. 56,158 (final

admin. review) (Dep't of Commerce Sept. 12, 2011) and accompanying Issues & Decision

(I&D) Memo cmt. 2.I (Final Results); *Antidumping Methodologies in Proceedings Involving*

*Non-Market Economies: Valuing The Factor of Production:  Labor*, 76 Fed. Reg. 36,092 (Dep't

of Commerce June 21, 2011) (New Labor Methodology).

On November 15, 2012, the Court remanded the final results to Commerce to reconsider

or to further explain its decision to value labor solely on the basis of data from Bangladesh.

Specifically, the Court held that the decision to value labor based solely on data from

Bangladesh, although reasonable on its face, was not supported by substantial evidence because

Commerce did not reconsider its prior findings, made when Commerce had relied upon a prior

labor valuation methodology, that wage rates strongly correlate to *per capita* GNI and, therefore,

require special consideration.  *See Camau I*, 880 F. Supp. 2d at 1358-59.  The Court additionally

determined that the facts on the record of the case, namely the difference between the GNIs and

wage data from Bangladesh and the Philippines, seemed to highlight the very concerns about

valuing labor on the basis of a single country that Commerce had raised when supporting its

prior wage-rate methodology.  *See id.* at 1359-60.  The Court thus found that, by accounting for

neither its prior finding of a correlation between wage rates and GNI nor the disparity in both

wage rates and GNIs of the proposed surrogate countries, Commerce's use of the Bangladeshi

data to value labor was not supported by substantial evidence.  *See id.* at 1360-61.  Hence, the

Court ordered Commerce either to reconsider the reasonableness of valuing labor using only data

from the primary surrogate country or to provide further explanation for its decision.  *See id.*

## II.      Commerce's Remand Redetermination

In accordance with the Court's remand order, Commerce reexamined the labor wage

methodology in light of the evidence on the administrative record, and its prior findings in other

proceedings.  As noted above, the Court remanded this case after holding that Commerce had

failed to account for its prior finding of a correlation between wage rates and GNI that supported

treating labor differently from other factors of production, and the difference in the two wage

rates and GNIs of the proposed surrogate countries in this case, Bangladesh and the Philippines.

*See id.* at 1358-60.  On remand, Commerce accounted for these factors and determined that labor

should continue to be valued using data from Bangladesh as the primary surrogate country.

Commerce acknowledged in its remand results that there is both a strong positive

relationship between labor wage rates and GNI, as well as large variation in the individual wage

rates of comparable market economies.  *See* Final Results of Redetermination Pursuant to

Remand at 3-4 (Dep't of Commerce Apr. 12, 2013) (Remand Results).  At the same time,

Commerce explained that 19 U.S.C. § 1677b(c)(4) (section 773(c)(4) of the Tariff Act) expressly

authorizes it to calculate normal value using the prices or costs of factors of production "in *one*

*or* more market economy countries."  *Id.* at 2 (emphasis added).  Commerce then set forth in

detail, why, in exercising its statutory discretion, shrimp industry-specific data from the primary

surrogate country are the best available information to value labor in this case.

Commerce first explained that it previously had addressed the positive relationship

between wage rates and GNI and the large variation in the individual wage rates of market

economies through a regression-based methodology that took both of these factors into consideration.  The regression-based methodology addressed these factors by considering a large number of data points from various countries, which reasonably smoothed out the variation. However, as Commerce explained in its remand results, the Courts struck down Commerce's practice as being inconsistent with the antidumping statute.  *See id*. at 3-5.

Commerce next explained how intervening legal developments limited the effectiveness of using multiple countries to value labor to the point of making it inappropriate to rely on data form multiple countries for the data-smoothing purposes that Commerce had initially articulated. Initially, because judicial decisions, such as *Dorbest ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010), prevented Commerce from relying on the regression-based labor methodology, Commerce replaced it with an interim labor methodology.  Under the interim methodology, instead of using regression analysis, Commerce calculated a simple-average wage rate, reasoning that it was better to average data from multiple countries because of its past experience with variation in wage rates among economically comparable market economy countries.  *See* Remand Results at 3-5.  This Court's decision in *Shandong Rongxin Imp. & Exp. Co. v. United States*, 774 F. Supp. 2d 1307, 1314-16 (Ct. Int'l Trade 2011), however, further narrowed the universe of countries available to Commerce for averaging purposes, in some cases limiting Commerce to just two or three countries.  *See* Final Results at I&D Memo cmt. 2.I.

In contrast to the regression methodology, which relied upon several dozen data points, the limited data pool available subsequent to *Shandong* left little, if any, benefit from averaging wages in order to address variation in wage rates across multiple countries.  As Commerce explained in the remand results, an averaging methodology based on a limited number of data points "cannot adequately account for the existence of the correlation between wage rates and

GNI and the variation among wage rates of economically comparable countries[.]"  Remand

Results at 7.  In other words, with few data points, the results of any averaging exercise would

not be any "better" or more accurate than using a single data point.

Hence, on remand, Commerce determined that the benefits of valuing labor using data

from the primary surrogate country now outweigh any benefit of averaging wages from the

limited number of countries that satisfy all of the statutory criteria as applied in *Shandong*.

Specifically, Commerce explained that the benefits of relying on data from the primary surrogate

country include the fact that it is consistent with the manner in which Commerce values all other

factors of production, resulting in a uniform basis for Commerce's calculations.  *See* Remand

Results at 6-7.  In this regard, Commerce further explained that this Court has held that "the

preference for use of data from a single country could support a choice of data as the best

available information where the other available data 'upon a fair comparison, are otherwise seen

to be fairly equal.'"  *See id* at 7-8 (discussing *Peer Bearing Co-Changshan v. United States*, 804

F. Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011)).

Equally importantly, Commerce explained that sourcing data from the primary surrogate

country better reflects the trade-off between labor costs and other factors costs, such as capital,

based on their relative prices.  *See* Remand Results at 8.  Thus, as Commerce further explained,

valuing labor using primary surrogate country data enables Commerce to capture the complete

interrelationship of factor costs that a producer in the primary surrogate country faces.  *See id*.

Correspondingly, Commerce noted that this Court has upheld Commerce's preference for using

surrogate value data from a single country because it limits the amount of distortion introduced

into Commerce's calculations.  *See id* at 7 (discussing *Clearon Corp. and Occidental Chemical*

*Corp. v. United States*, No. 08-0364, 2013 Ct. Intl. Trade LEXIS 27, at *15-16, 20-21 (Ct. Int'l

Trade Feb. 20, 2013).  Commerce additionally explained that its previous averaging methodology entailed significant administrative burdens for little benefit.  *See id*. at 11-12, 13. In short, Commerce balanced its general preference for using data from a single primary surrogate country (based on various advantages) against the now diminished effectiveness of averaging labor data and concluded that data from the primary surrogate country constitute the better information for purposes of labor valuation.

Regarding the difference the Court identified in the wage rates of the proposed surrogate countries in this case, Bangladesh and the Philippines, Commerce determined that the wage rates were reported on different bases.  Commerce explained that the Bangladeshi labor data consist of wages specific to the shrimp processing industry, whereas the Filipino labor data represent wages for the more generic food and beverage processing industry.  Commerce thus concluded that, because the two wage rates represent two different levels of aggregation, a comparison of data does not evidence disparity among the shrimp industry wage rates of these two economically comparable economies.  *See id*. at 8, 15-16.

Accordingly, Commerce found that the labor data from the primary surrogate country, Bangladesh, are the best available information for valuing labor for this remand.

## ARGUMENT

**I.**   **Standard Of Review**

 "The specific factual findings on which [Commerce] relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009); 19 U.S.C. § 1516a(b)(1)(B)(i).   "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence also may be "less

than the weight of the evidence," and the possibility of drawing inconsistent conclusions from record evidence does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.    Commerce Properly Determined That Data From The Primary Surrogate Country, Bangladesh, Is The Best Available Information For Valuing Labor

Consistent with the Court's remand instructions, Commerce examined the issues that the Court identified and reasonably determined that, on the facts of this case, data from the primary surrogate country, Bangladesh, are the best available information for valuing labor.  The Court has already sustained Commerce's new labor valuation methodology relying on data from the primary surrogate country as reasonable on its face, and, contrary to AHSTAC's claims, Commerce did exactly what the Court ordered it to do in *Camau I* by accounting for its prior findings concerning labor and expressly addressing the difference in the wage data between Bangladesh and the Philippines.  *See Camau I*, 880 F. Supp. 2d at 1358, 1360-61.  Commerce's redetermination is thus supported by substantial evidence on the record and is otherwise in accordance with law.  AHSTAC's contentions, by contrast, mischaracterize Commerce's determination and rely on false assumptions that do not undermine the reasonableness of Commerce's determination.  Hence, Commerce's determination should be sustained.

**A.  Commerce Properly Addressed The Findings That Prompted Its Prior Labor Methodology**

First, AHSTAC is incorrect that Commerce has not adequately explained its alleged "departure" from the findings that prompted its prior labor methodology.  As we demonstrated above, Commerce properly reexamined the use of its new labor wage methodology in light of its prior findings and fully explained why those findings were no longer paramount as a basis for treating labor differently from other factors of production.  Commerce specifically explained that intervening legal precedent had severely limited its ability to account for variation in labor wage rates, meaning that its prior averaging methodology "cannot adequately account for the existence of the correlation between wage rates and GNI and the variation among wage rates of economically comparable countries[,]" Remand Results at 7, and hence that the "benefits of relying upon the primary surrogate country to determine the labor surrogate value outweigh the benefits of attempting to adjust for any variation with a limited data set." *Id.* at 13.

Thus, while Commerce continues to acknowledge a strong positive relationship between labor wage rates and GNI, as well as a large variation in the individual wage rates of comparable market economies, this is not the end of the inquiry.  Commerce in the remand results considered the diminished effectiveness of the tools available to address it prior findings and balanced them against its general preference stemming from the various advantages of using data from a single surrogate country—which generally increases the accuracy and uniformity of valuation— concluding that the balance favored relying on data from the primary surrogate country.  *See id.* at 6-9, 12-13.  In doing so, Commerce specifically explained that sourcing data from the primary surrogate country better reflects the trade-off between labor and other factor costs (such as capital) based on their relative prices, and thus enables Commerce to capture the complete interrelationship of factor costs that a producer in the primary surrogate country faces.  *See id.*

Not only did Commerce determine that relying on data from the primary surrogate country has distinct advantages for accuracy and uniformity purposes, it also concluded that "[g]iven that the averaging methodology is difficult to administer, and continues to result in variability in a way that the regression method did not, relying on the primary surrogate country for labor is a more sound and accurate methodology, consistent with the practice for determining surrogate values for other [factors of production]." *Id*. at 13. In other words, Commerce has not claimed that its prior findings ceased to exist, but simply that they cannot be effectively addressed given the constraints resulting from prevailing jurisprudence, and hence no longer constitute Commerce's paramount concern in selecting a surrogate value for labor.

Moreover, Commerce's determination regarding the superiority of relying on data from a single primary surrogate country is supported by this Court's jurisprudence. In *Clearon*, for example, this Court sustained Commerce's preference for deriving surrogate data from a single country because it limits the amount of distortion introduced into Commerce's calculations. *See* 2013 Ct. Intl. Trade LEXIS 27, at *20-21. Here, on remand, Commerce explained why the Court's reasoning in *Clearon* also applies to labor:

> Although the *Clearon* decision invoked this reasoning primarily for non-labor inputs, [Commerce] finds this line of reasoning is equally true for labor as well. For example, producers in Bangladesh do not have access to the labor inputs in the Philippines. Thus, producers in Bangladesh make decisions regarding their factor utilizations, including labor, based on their relative price structure in-country, not the price of factors across countries. When [Commerce] relies on factor prices outside the primary surrogate country, this relationship no longer exists. Therefore, the new single country wage rate methodology allows [Commerce] to better capture this relationship between factors.

Remand Results at 12-13. Similarly, in *Peer Bearing*, this Court held that "the preference for use of data from a single country could support a choice of data as the best available information

where the other available data 'upon a fair comparison, are otherwise seen to be fairly equal.'"

*Peer Bearing*, 804 F. Supp. 2d at 1353 (citation omitted).  Commerce's determination is also d

fully in accordance with its express statutory authorization to value the factors of production on

the basis of prices or costs "in *one or* more market economy countries."  19 U.S.C. § 1677b(c)(4)

(emphasis added).  In short, Commerce provided a reasonable explanation as to why it now treats

labor in the same manner as all other factors of production, even though it treated labor

differently in the past.

     AHSTAC's contention that Commerce did not provide an adequate explanation lacks

merit.  AHSTAC first argues that the remand determination is "devoid of any attempt to explain

why Commerce's prior factual findings are no longer persuasive . . ."  Pl. Br. 10.  AHSTAC,

however, mischaracterizes Commerce's remand determination in support of this argument.

Commerce did not find that its prior findings regarding the existence of a correlation between

wage rates and GNI and variation among wage rates of economically comparable economies are

unpersuasive or incorrect.  Rather, Commerce found that the legal landscape has changed and

that the new limitations to the data pool have diminished the effectiveness of simple averaging in

addressing the factors that are unique to labor.  Commerce further provided a multifaceted

explanation that balanced the diminished effectiveness of averaging against the advantages of

relying on primary surrogate country data in terms of accuracy and uniformity, as well as against

the administrative burden (for little benefit) of averaging.  *See, e.g.,* Remand Results at 6-9, 12-

13.  With the limited effectiveness of simple averaging, and the advantages of relying on data

from a single country, the balance has shifted in favor of the general preference of using the

labor wage data from a single primary surrogate country.  This hardly constitutes "completely

disregard[ing]" the prior findings, as AHSTAC incorrectly contends.  Pl. Br. 10.

AHSTAC relatedly claims that the reasoning animating Commerce's preference for using a single country to value factors of production is not a valid basis for Commerce's determination because it "existed throughout the decades, when multiple countries were used to value labor." Pl. Br. 14.  Commerce, however, clearly explained in the remand results that, while its preference for using a single country to value the factors of production existed for many years, relatively recent judicial developments have curtailed the effectiveness of its methodologies treating labor differently, shifting the balance.  *See, e.g.,* Remand Results at 6-9, 12-13.

Moreover, contrary to AHSTAC's (inaccurate) claims, Commerce has not adopted the position that its single country labor methodology is "better" merely because it is "new."  *See* Pl. Br. 14.  Commerce explained its new methodology's advantages for accuracy and uniformity because it enables Commerce to capture the complete interrelationship of factor costs that a producer in the primary surrogate country faces.  Commerce provided the following example:

> For example, producers in Bangladesh do not have access to the labor inputs in the Philippines.  Thus, producers in Bangladesh make decisions regarding their factor utilizations, including labor, based on their relative price structure in-country, not the price of factors across countries.  When [Commerce] relies on factor prices outside the primary surrogate country, this relationship no longer exists.  Therefore, the new single country wage rate methodology allows [Commerce] to better capture this relationship between factors.

Remand Results at 13.  AHSTAC, by contrast, does not meaningfully address the advantages of relying on data from the primary surrogate country Commerce has articulated, beyond making its inaccurate timing argument.  *See* Pl. Br. 13-14.  Nor does AHSTAC articulate any basis to claim that the rationale this Court sanctioned in *Clearon* for preferring data from a single primary surrogate country does not apply to labor.  *See id.*  That AHSTAC disagrees with Commerce's

balancing of these advantages against the diminished effectiveness of averaging does not make Commerce's well-supported determination any less reasonable.

AHSTAC also incorrectly contends that Commerce is prohibited from considering the difficulty of administering the interim labor wage methodology as a factor in its decision to rely on primary surrogate country data. *See* Pl. Br. 10-11. Both this Court and the United States Court of Appeals for the Federal Circuit have rejected AHSTAC's position. *See*, *e.g.*, *Pakfood Public Co. Ltd. v. United States*, 753 F. Supp. 2d 1334, 1343 (Ct. Int'l Trade 2011) (holding that the "ease of administrative burden[s]" and "[improving] efficiency" are adequate reasons for Commerce to depart from prior practice); *Consol. Edison Co. of N.Y., Inc. v. Abraham*, 314 F.3d 1299, 1304 (Fed. Cir. 2002) (holding that "administrative convenience" and facilitating "efficient administration" constitute "reasonable and rational" reasons for agency action).

Correspondingly, none of the cases AHSTAC cites support AHSTAC's argument that Commerce was prohibited from considering administrative burden. *See* Pl. Br. 10-11. For example, *SKF USA, Inc. v. United States,* 630 F.3d 1365 (Fed. Cir. 2011), does not discuss, or even reference, administrative convenience or burden. In *SKF*, Commerce used different definitions of the statutory term "domestic like product" in different contexts, and the Court held that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *Id*. at 1382. In this case, Commerce provided detailed reasons for adopting its new labor wage methodology, and the new methodology applies in all non-market economy cases. AHSTAC's analogy to *SKF* is thus inapposite.

Similarly, the partial quote that AHSTAC provides from *Anderson v U.S. Secretary of Agriculture*, 30 CIT 1742, 1748 (Ct. Int'l Trade 2006), does not support AHSTAC's position. The full quote AHSTAC excerpts reads: "The Secretary may justify discriminating between

individuals on the grounds of administrative convenience, but ease of administration does not

obliterate the Secretary's obligation to provide substantial evidence and follow fundamental

principles of justice." *Id*.  Here, by contrast, Commerce has provided a thorough, multifaceted

explanation for its decision to value labor using data from the primary surrogate country that

focuses both on the advantages of doing so and the lack of benefit from alternative approaches,

in addition to administrative burden issues.  There is absolutely no allegation or evidence that

Commerce is discriminating between individuals or violating fundamental principles of justice,

and Commerce's consideration of administrative burden among several other factors hardly

"obliterate[d]" the substantial evidence requirement.  AHSTAC merely disagrees with

Commerce's methodological choice, which is not a basis for overturning it.

AHSTAC reliance on the Court of Appeals for the Tenth Circuit's 1967 decision in

*United States v. Udy*, 381 F.2d 455 (10th Cir. 1967), is equally misplaced.  In *Udy*, the wife of an

civilian Air Force employee recovered an award under the Federal Torts Claims Act on behalf of

herself and her children, but the Government contended that her claim was barred by application

of the Federal Employee Claims Act because it construed the statutory term "while in

performance of duty" to apply whenever a person is present on federal government premises.

The court disagreed with this "premises rule," discussing a litany of evidence that indicated that

the deceased left his work site and his death was remote in time, space and activities from the

duties of his employment.   In addressing the argument that the rule was easy to administer, the

court stated that "ease of administration does make an administrative determination less

arbitrary, when it otherwise had no substantial evidence to support it."  *Id*. at 458.

Unlike in *Udy*, Commerce's determination to value labor using data from a single

primary surrogate country is *expressly permitted* by the antidumping statute and supported by

substantial evidence of the advantages of doing so (as well as the diminished benefit from other methodologies). Although AHSTAC disagrees with Commerce's methodological choice, it has not demonstrated that it is unreasonable for the agency to consider improved administrative efficiency as a factor in adopting a new methodology that, as this Court already held, "is reasonable on its face." *Camau I*, 880 F. Supp. 2d at 1358.

In addition, AHSTAC faults Commerce's finding that the original intent with respect to the interim methodology of providing a predictable methodology was fundamentally undermined. *See* Pl. Br. 11-13. It is reasonable, however, for the agency to take into account the fact that an original justification for adopting the interim methodology of enhanced predictability is no longer valid. Moreover, AHSTAC mischaracterizes Commerce's remand determination by suggesting that Commerce explained that the use of wage data from a primary surrogate country was designed to ensure that the parties can predict the labor factors of production at the outset of the review. *See id*. at 12. Commerce did not make such a determination, but merely found that predictability was one of the primary goals for adopting interim methodology and that the interim methodology has fallen short of meeting this goal. *See* Remand Results at 11-13.

Finally, AHSTAC's argument suffers from the false assumption that, because Vietnam's GNI is between that of Bangladesh and the Philippines, a labor wage rate between those of the two countries is a more "predictive" surrogate value. This is apparent from AHSTAC's reliance on the notion that wage rates may be overstated when the surrogate country has a low GNI and overstated when the surrogate country has a high GNI. *See*, *e.g.*, Pl. Br. 12. Commerce, however, repeatedly has made clear that, in addition to the positive correlation between GNI and labor wage rates, there is considerable variation among the labor wage rates of economically comparable countries because wages depend on idiosyncratic, country-specific factors such as

labor policies.  *See*, *e.g.*, Remand Results at 3-4.  Given this variability, averaging a small number of data points does not ensure that one will obtain a number that more "predictive" of what a market economy ware rate would be in Vietnam than the wage rate in Bangladesh itself. Nor does AHSTAC's assumption account for the additional benefits Commerce identified of sourcing surrogate values from a single primary surrogate country in order to capture the interrelationship among different factors.  Thus, AHSTAC's "predictability" arguments do not undermine Commerce's reasonable remand determination.

> **B.    Commerce Properly Addressed The Record Evidence And The Court's Concerns Regarding The Difference In Wage Rates Between Bangladesh And The Philippines**

AHSTAC argues that Commerce "committed legal error by continuing to neglect record evidence" and that Commerce of "manufacturing a lack of dataset comparability."  Pl. Br. 15. Commerce did not "manufacture" anything.   Rather, Commerce considered the record evidence (including the evidence specifically identified by the Court) and expressly addressed the difference between the labor wage data from the Philippines and Bangladesh.   AHSTAC simply disagrees with the conclusions that the agency drew from the evidence and improperly asks the Court to substitute its judgment for that of Commerce.   Under the standard of review, however, AHSTAC's disagreement with the agency's conclusions does not constitute a ground for reversal.  *See Consolo*, 383 U.S. at 619-20 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").

On remand, Commerce addressed the Court's concern that there appeared to be a significant difference between the labor rates of Bangladesh and the Philippines, the two countries that Commerce found during the administrative review satisfied the three factors that

Commerce considers in choosing surrogate countries (economic comparability, significant production of comparable merchandise, and quality of data).  Commerce explained that the record evidence demonstrates that data from these two countries were reported on a different basis.  *See* Remand Results at 8, 15-16.  AHSTAC cannot dispute that the Filipino labor data represent wages for the entire food and beverage processing industry, whereas the Bangladeshi labor data represent wages specific to the shrimp processing industry.  *See id*.  Because the two wage rates are based upon two different industrial categories, and hence, represent two different levels of aggregation, Commerce properly found that "the difference in the wage rates is not based on an 'apples-to-apples' comparison."  *Id*. at 16.[1]

AHSTAC argues that both wage rates from Bangladesh and the Philippines are "industry specific" and that Commerce must support the lack of comparability with some reason why these values would be expected to differ from each other.  Pl. Br. 16.  Commerce, however, has already provided the reason as to why these sets of data lack comparability.  The Filipino data represent the entire food and beverage processing industry, whereas the Bangladeshi data are specific to the shrimp processing industry, meaning that the two data sets stem from industrial categories representing two different levels of aggregation.  Thus, the difference between the two does not necessarily demonstrate that the Bangladeshi data are an inappropriate surrogate value for labor in Vietnam—let alone overcome the advantages Commerce articulated of relying on surrogate value data from a single primary surrogate country.

AHSTAC further argues, incorrectly, that Commerce made industry specificity a paramount consideration in its remand redetermination.  This mischaracterizes Commerce's

---

[1] In addition, Bangladesh and the Philippines have GNIs at the opposite ends of the range of economically comparable countries to Vietnam, meaning one would not expect them to have similar wage rates.

remand redetermination because Commerce made it clear that it did not select Bangladeshi data because it was more industry specific than other data sources:

> AHSTAC is also incorrect when it states that [Commerce] selected the Bangladeshi data due to industry specificity. [Commerce] did not select the Bangladeshi data because they were more specific than the other labor rates on the record. Rather, [Commerce] selected the Bangladeshi labor data based upon its preference under the *New Labor Methodology* for using the labor data from the primary surrogate country, and the fact that the Bangladeshi data was found to be best available information for the labor value in that country.

Remand Results at 17. In other words, the mere fact that Commerce noted the differing levels of industry-specificity between the two data sets in addressing the Court's concern does not change the fact that Commerce's paramount consideration in selecting a labor surrogate value under its new labor methodology is obtaining data from the primary surrogate country.

AHSTAC also argues that, in a prior administrative review of this order, Commerce found that reliance on Bangladeshi data would be "unreliable and arbitrary." *See* Pl. Br. 17. Commerce, however, did not find that the Bangladeshi data were aberrant or *per se* unusable. It merely explained that it would be unreliable and arbitrary to rely solely on Bangladeshi data, when at the time its methodology was to use data from multiple countries because it believed it was possible to smooth-out variation by doing so. *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 75 Fed. Reg. 47,771 (Dep't of Commerce Aug. 9, 2010) (final admin. review) at I&D Memo cmt. 9. Commerce subsequently changed its methodology in light of further developments, and has determined that relying on industry-specific wages from the primary surrogate country is now the best approach for valuing the labor input in non-market economy antidumping duty proceedings. *See* New Labor Methodology at 36,093. Moreover, Commerce's statutory mandate is to use the "best available" information, not "perfect"

information, and Commerce has thoroughly and reasonably articulated why the benefits of using primary surrogate country data now outweigh the attenuated benefits (if any) of the averaging methodology on which Commerce relied in the prior review.  *See* 19 U.S.C. § 1677b(c)(1)(B).

AHSTAC next argues, incorrectly, that Commerce acted contrary to its current labor methodology by not using International Labor Organization (ILO) Chapter 6A data.  *See* Pl. Br. 18.  AHSTAC's argument is misleading and mischaracterizes Commerce's methodology because the Federal Register notice that AHSTAC excerpts states that Commerce "will base labor costs on ILO Chapter 6A data *applicable to the primary surrogate country* rather than the Chapter 5B it currently uses."  New Labor Methodology, 76 Fed. Reg. at 36,093 (emphasis added).  There can be no reasonable dispute that the paramount consideration in Commerce's current policy is to value labor solely based on data from the primary surrogate country.  *See id*.  On remand, and in previously adopting its current policy, Commerce viewed industry-specific wage data from the primary surrogate country as the best available information because their use is consistent with how Commerce values all other factors of production, and it results in the use of a uniform basis for factor of production valuation.  *See id*; Remand Results at 5-6.  When, as here, ILO Chapter 6A does not contain data applicable to the primary surrogate country, Commerce may reasonably use other reliable, government-generated data from the primary surrogate country.

## III.   AHSTAC Has Failed To Demonstrate That The Bangladeshi Data Are Aberrant

AHSTAC argues that the labor wage rate data from Bangladesh are aberrant because the data differ from the ILO data from the Philippines and a handful of other countries.   Citing this Court's decision in *Peer Bearing*, AHSTAC argues that "upon fair comparison" the Bangladeshi data are not "fairly equal" when compared to other values on the record.  *See* Pl. Br. 22-23. Contrary to AHSTAC's claims, its comparison of data from two different industrial categories is

not a "fair comparison" and its "analysis" thus does not demonstrate that the Bangladeshi data are aberrant or would lead to distortion.

The Court has held that a party cannot "prove distortion simply by pointing to contrasting figures – with no supporting rationale or analysis whatsoever. . . ." *See United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1342 (Ct. Int'l Trade 2010) (citing *U.S. Ass'n of Imps. of Textiles & Apparel v. United States*, 413 F.3d 1344, 1353 (Fed. Cir. 2005) (dismissing party's argument when party failed to "support its assertion . . . with any reasoning, evidence, or precedent"); *Consol. Int'l Automotive v. United States*, 809 F. Supp. 125, 130 (Ct. Int'l Trade 1992) (rejecting party's argument when party failed to "support its objection to [the agency's] choice other than by conjecture . . .")).  Similarly, in this case, AHSTAC's mere statements that the Bangladeshi data are different from the wage rates of other countries on the record[2] do not demonstrate with record evidence that the differences in value are aberrational.  AHSTAC does not point to any flaw in the Bangladeshi data, which constitute an official government of Bangladesh statistic, or to any flaw in the way in which the data were reported.  AHSTAC also glosses over the critical fact that the two contrasting figures the Court identified represent two different industrial categories—the shrimp industry in Bangladesh and the overall food and beverage processing industry in the Philippines.  Accordingly, although that Bangladeshi wage rate may be lower than that of other countries, Commerce reasonably concluded that there was no record evidence to show that the Bangladeshi data are aberrationally low.

---

[2]  In the original determination, Commerce found that only the data from Bangladesh and Philippines satisfied all of its three selection criteria to value labor.  Although the data from a handful of other countries were on the record, Commerce did not find that these satisfied its three selection criteria (nor was it asked on remand to make such a finding by any of the interested parties).  On remand, Commerce found that the other countries' data comprise a different level of aggregation than the shrimp-specific Bangladeshi data and, thus, are not comparable to Bangladeshi data.  *See* Remand Results at 16.

In addition, AHSTAC's efforts to claim that the Bangladeshi data are aberrant merely because they reflect a lower wage rate than that of one or more other countries continues to suffer from the false assumption that, because Vietnam's GNI is between that of Bangladesh and the Philippines, a labor value based on averaging a handful of data points must be a "better" surrogate value for a market economy wage rate in Vietnam than the Bangladeshi data.  Hence, AHSTAC argues that Commerce should average data to derive a higher rate, or simply choose data from a country with a higher rate, in order to eliminate variation inherent in Bangladesh's lower rate.  *See* Pl. Br. 20-21, 28.  The fallacy of AHSTAC's position is that there is nothing to suggest that a higher wage rate value between that of Bangladesh shrimp industry and that of the general food and beverage industry in the Philippines is a "better" reflection of what a market economy wage rate would be in Vietnam.  *See* Remand Results at 20 ("[T]he fact that Bangladesh is the lowest of these [labor] values does not mean that it is an inherently aberrational rate,").  Indeed, Commerce has repeatedly stated that, in addition to the positive correlation between GNI and wage rates, there is considerable variability among the wage rates of economically comparable countries due to country-specific factors.  *See*, *e.g.*, *id.* at 3-4.

Further, Commerce has already determined, and this Court has sustained as a general matter, that averaging using a small number of data points does *not* effectively eliminate variation, meaning that the wage rate values that AHSTAC advocates are not more likely to reflect a market economy rate for Vietnam than the Bangladeshi data (hence Commerce's reference to *Peer Bearing*'s holding regarding data choices that are "fairly equal").  This is especially so because the data AHSTAC advocates stem from a different and more general industrial category than the shrimp-specific Bangladeshi data, while also sacrificing the accuracy

advantages Commerce identified from being able to account for the interrelationship of various factors of production when using data from a single primary surrogate country.

Moreover, AHSTAC's argument that Commerce failed to consider ILO data from Guyana, Nicaragua, and India lacks merit.  As an initial matter, the Court did not instruct Commerce to compare all labor values on the record.  The Court focused on Bangladesh and the Philippines because those were the only two countries that Commerce previously determined satisfied all of Commerce's criteria for use as surrogate countries.  *See Camau I*, 880 F. Supp. 2d at 1359-60 & n.12.  The Court's holding that Commerce's original explanation was not supported by the record evidence was based upon the comparison of the GNIs of Bangladesh and the Philippines and its conclusion that the "disparity in GNI is reflected in a disparity between the wage rates of the two countries." *Id*. at 1360.  The agency addressed this disparity.

Nonetheless, Commerce did consider the other countries' data in addressing AHSTAC's argument that the Bangladeshi data are aberrational.   Specifically, Commerce found that the Bangladeshi data, which are also from the primary surrogate country for the review, are not comparable with the labor data from these countries because the labor data from these countries (like that of the Philippines) are not reported on the same basis as the Bangladeshi data.  *See* Remand Results at 16.  Accordingly, AHSTAC's attempt to compare and contrast the Bangladeshi data with the labor values in the ILO data is fundamentally flawed.

Attempting to further support its flawed arguments, AHSTAC asserts that Commerce "recently rejected [factor of production] data after comparing values amongst countries in an administrative review of the [antidumping duty] order on shrimp from China."  Pl. Br. 23 (citing *Certain Frozen Warmwater Shrimp from the People's Republic of China*, 77 Fed. Reg. 53,856 (Dep't of Commerce Sept. 4, 2012) (final admin. review) (*Shrimp from China*)).  AHSTAC

further argues that Commerce rejected factor of production data from the primary surrogate country in *Shrimp from China* after comparing it with imports made during the period of review by economically comparable countries. *Id*. Although we do not disagree with the general proposition that Commerce may compare data regarding factors of production from different countries in deciding whether a particular dataset is aberrational, this does not mean that Commerce must ignore fundamental differences in the datasets that could affect the comparison.

Thus, AHSTAC's reliance on *Shrimp from China* is misplaced. In *Shrimp from China*, Commerce compared imports for the same industrial category (the shrimp industry), whereas here AHSTAC advocates comparing labor data from the shrimp industry with data from a broader industrial category comprising other countries' entire food and beverage industries. Equally importantly, in *Shrimp from China*, Commerce compared data from different countries in the context of identifying and analyzing specific abnormalities in the Thai import data at issue. For example, Commerce noted record evidence that the white shrimp species produced in Thailand require a lower protein content in their feed (effectively lowering the price of feed), which called into question a party's claim that the Thai data were more specific to white shrimp when (contrary to what one would expect of that were true) the data reflected significantly higher feed prices than purportedly less white shrimp-specific data from Indonesia. *See Shrimp from China*, 77 Fed. Reg. 53,856 at I&D Memo cmt. 10. AHSTAC has not demonstrated any such abnormalities in this case.

Similarly, *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295 (Ct. Int'l Trade 2007), does not support AHSTAC's arguments. In *Mittal Steel*, the Court ordered Commerce to justify the use of Filipino import data for limestone in light of the value of limestone imported from other countries. *See id*. at 1305-10. As in *Shrimp from China*, however, the party

challenging use of the Filipino data identified specific anomalies, including that the data were derived from very low import volumes (contrary to Commerce's preferred practice) and involved imports from the United States. *See id*. at 1306 and n.13-14.  Commerce also had admitted that it chose the data essentially by default because other options were also aberrational, whereas here Commerce has articulated specific reasons why it prefers data from Bangladesh as the primary surrogate country and there is no allegation that the data itself is inaccurate or distorted. *See id*. at 1307, 1308.  Nor did the Court in *Mittal Steel* order Commerce to compare the import value of limestone with a broader product category, such as a basket category that includes all types of stones.  Here by contrast, AHSTAC argues that Commerce should compare shrimp industry wage rates with those from the broader food and beverage industry.

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. V. United States*, No. 11-0456, 2013 Ct. Int'l Trade LEXIS 34 (Ct. Int'l Trade Mar. 11, 2013), also does not support AHSTAC's arguments. In *Xinjiamei Furniture*, Commerce valued the cold-rolled steel input in the subject merchandise by relying on import statistics for 716 metric tons of cold-rolled steel, which represented 0.047 percent of production of a single Indian producer and "a truly miniscule percentage of overall Indian cold-rolled steel production." *Id*. at *18-19.  The Court thus noted Commerce's practice under which it "would normally ensure that a small quantity of imports did not produce a price that is aberrational relative to other sources of market value" and found that Commerce skipped this step. *Id.*  Here, by contrast, Commerce is relying on official government statistics regarding labor in Bangladesh and there is no evidence, or even an allegation, that the Bangladeshi data are "miniscule."  Moreover, the values compared in *Xinjiamei Furniture* were product-specific, and the Court did not ask Commerce to compare the pricing data for cold-rolled steel, with pricing for a broader category of products such as all types of steel.  Again here, by contrast, AHSTAC

24

attempts to draw conclusions by comparing labor wage rates from the shrimp industry with labor wage rates from the overall food and beverage industry, a broader industrial category.

Finally, to the extent AHSTAC argues that, despite the concerns about continued averaging that Commerce expressed in adopting its new labor methodology, Commerce could still have averaged ILO data here, the mere existence of a handful of alternative data points in this case does not alleviate the systemic concern that led Commerce to abandon the interim methodology in favor of data from the primary surrogate country. *See* Pl. Br. 28. As this Court stated in *Camau I*: "In light of *Dorbest IV* and *Shandong*, Commerce cannot find enough countries that are both economically comparable and significant producers of subject merchandise to effectively average wages from multiple countries." 880 F. Supp. 2d at 1358. Congress could have expressly created a special rule for valuing labor in the antidumping statute, but it did not, and the same statutory provision thus governs valuation of all factors of production, including labor. Nor does AHSTAC's argument that averaging is possible take into account the advantages of using data from a single primary surrogate country that Commerce identified and weighted against the diminished effectiveness of averaging based on a small number of data points.

Admittedly, labor presents unique challenges when it comes to its valuation. However, as the Federal Circuit has explained, "[c]onstructing values for use in antidumping investigations is by necessity imperfect. Where . . . undertaken under a reasonable interpretation of the statute . . . we will not disturb the results." *Thai I-Mei Foods Co. v. United States*, 616 F.3d 1300, 1309 (Fed. Cir. 2010). On remand, Commerce has struck a reasonable balance between the preference for using a single surrogate country for valuing factors of production (which generally improves accuracy and minimizes distortions in the dumping calculations) and the

unique aspects of labor.  And, as the Court ruled previously, Commerce's new methodology "is reasonable on its face." *Camau I*, 880 F. Supp. 2d at 1358.  The possibility that Commerce could have struck a different balance and employed another methodology for valuing labor does not render Commerce's current methodological choice of relying on data from the primary surrogate country unreasonable.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter judgment for the United States.

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

OF COUNSEL:                        /s/ Joshua E. Kurland
MYKHAYLO A. GRYZLOV        JOSHUA E. KURLAND
Senior Attorney                    Trial Attorney
Office of the Chief Counsel        Department of Justice, Civil Division
   for Import Administration       Commercial Litigation Branch
U.S. Department of Commerce        P.O. Box 480
                                   Ben Franklin Station
                                   Washington, DC 20044
                                   Tel:  (202) 616-0477
                                   Fax: (202) 307-0972
                                   Email:  Joshua.E.Kurland@usdoj.gov

July 18, 2013                      *Attorneys for Defendant United States*