## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CAMAU FROZEN SEAFOOD PROCESSING IMPORT EXPORT CORPORATION, ET AL.,<br><br>                      Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>                      Defendant,<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE,<br>                      Defendant-Intervenor. | Before: Judge Donald C. Pogue<br><br>Consol. Court No. 11-00399 |

## **PROPOSED ORDER**

Pursuant to the U.S. Department of Commerce's Final Results of Redetermination issued in response to *Camau Frozen Seafood Processing Import Export Corporation, et al., v. United States*, 880 F. Supp. 2d 1348 (CIT 2012), filed on April 12, 2013, and all other proceedings and papers herein, it is hereby

ORDERED that the U.S. Department of Commerce's Final Results of Redetermination are sustained.

SO ORDERED.

 

_____
The Honorable Chief Judge Donald C. Pogue
United States Court of International Trade

Dated: _____, 2013
       New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| CAMAU FROZEN SEAFOOD PROCESSING IMPORT EXPORT CORPORATION, ET AL.,<br>        Plaintiffs,<br><br> v.<br><br>UNITED STATES,<br>        Defendant,<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE,<br>        Defendant-Intervenor. | Before:  Judge Donald C. Pogue<br><br>Consol. Court No.  11-00399 |

**RESPONDENT-DEFENDANT INTERVENOR MINH PHU SEAFOOD CORPORATION'S REPLY TO PETITIONER-PLAINTIFF AHSTAC'S COMMENTS ON FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

               Matthew R. Nicely
               **Hughes Hubbard & Reed LLP**
               1775 I Street, NW
               Washington, DC 20006
               (202) 721-4750
               (202) 729-4750 (fax)
               nicely@hugheshubbard.com

Dated: July 18, 2013

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................1

II. COMMERCE HAS FULLY EXPLAINED THE DEPARTURE FROM ITS PRIOR LABOR POLICY ...............................................................................................3

III. COMMERCE HAS FULLY RECONCILED ITS CHOICE OF BANGLADESH WITH THE RECORD EVIDENCE ....................................................................................5

IV. AHSTAC HAS NOT PROVEN THAT COMMERCE'S CHOSEN BANGLADESH LABOR RATE IS ABERRATIONAL .....................................................7

V. CONCLUSION ....................................................................................................................8

# TABLE OF AUTHORITIES

**Cases**

*Camau Frozen Seafood Processing Import Export Corp.*, 880 F. Supp. 2d 1348 (CIT 2012) ................................................................................................................................. 1

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .............. 7

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) .......................................... 2, 3, 4, 5

*Dorbest Ltd. v. United States*, 755 F. Supp. 2d 1291 (CIT 2011) .................................................. 2

*Dorbest Ltd. v. United States*, 789 F. Supp. 2d 1364 (CIT 2011) .................................................. 2

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 774 F. Supp. 2d 1307 (CIT 2011) . 2, 3, 4, 5

**Statutes**

19 U.S.C. § 1677b(c)(4) .................................................................................................................. 3

**Other Authorities**

*Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Dep't Commerce June 21, 2011) ........................................................................................................................ 3

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| CAMAU FROZEN SEAFOOD PROCESSING IMPORT EXPORT CORPORATION, ET AL.,<br><br>         Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>         Defendant,<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE,<br>         Defendant-Intervenor. | Before: Judge Donald C. Pogue<br><br>Consol. Court No. 11-00399 |

**RESPONDENT-DEFENDANT INTERVENOR MINH PHU SEAFOOD CORPORATION'S REPLY TO PETITIONER-PLAINTIFF AHSTAC'S COMMENTS ON FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

   Defendant-Intervenor Minh Phu Seafood Corporation ("Minh Phu") submits these comments in response to Plaintiff Ad Hoc Shrimp Trade Action Committee's (AHSTAC's) Comments on Final Results of Remand Redetermination Pursuant to Court Remand (Apr. 26, 2013) regarding the Final Results of Redetermination on remand filed by the Department of Commerce pursuant to this Court's remand order in *Camau Frozen Seafood Processing Import Export Corp.*, 880 F. Supp. 2d 1348 (CIT 2012) ("*Camau*"). These reply comments are timely filed. *See* Order (Dkt. No. 100, July 9, 2013). For the reasons set forth below, Minh Phu urges the Court to reject AHSTAC's comments and accept Commerce's Remand Results.

**I.  INTRODUCTION**

   In *Camau*, this Court ordered Commerce to reconsider its use of the $0.21 wage rate in the fifth administrative review ("AR5") of the antidumping duty ("AD") order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam"). *See Camau*, 880 F. Supp. 2d at 1357-61. This rate was derived exclusively from Bangladeshi labor data, in contrast

to the agency's prior approach of using data from multiple countries to value the labor factor of production ("FOP") in nonmarket economy ("NME") AD proceedings.  The Court held that the Department did not reconsider its prior findings, made when the Department used a prior multi-country wage-rate methodology, that wage rates strongly correlate to *per capita* gross national income ("GNI") and, therefore, require special consideration.  Additionally, the Court stated that the facts on the record of the case seemed to highlight the very concerns about valuing labor on the basis of a single country that the Department had repeatedly raised when supporting its prior multi-country wage-rate methodology.  Thus, the Court found that, by accounting for neither its prior finding of a correlation between wage rates and GNI nor the disparity in both wage rates and GNIs of the proposed surrogate countries, the Department's use of the Bangladeshi data to value labor was not supported by substantial evidence. In light of this, the Court ordered that the Department either reconsider whether it is reasonable to value labor using only data from the primary surrogate country or provide further explanation for its decision.

In its Remand Results, Commerce ultimately chose to further explain its decision, and in doing so has fully complied with the Court's order.  AHSTAC's arguments represent little more than an effort to re-litigate the *Dorbest*[1] and *Shandong*[2] line of cases that ultimately led to the Department's change in policy.  That is, despite AHSTAC and Commerce's agreement with one another that a multi-country approach to valuing labor is preferable and appropriate, the effect of the

---

[1] *Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ("*Dorbest IV*"); *Dorbest Ltd. v. United States*, 755 F. Supp. 2d 1291 (CIT 2011) ("*Dorbest V*"); *Dorbest Ltd. v. United States*, 789 F. Supp. 2d 1364 (CIT 2011) ("*Dorbest VI*").

[2] *Shandong Rongxin Imp. & Exp. Co. v. United States*, 774 F. Supp. 2d 1307 (CIT 2011) ("*Shandong*").

*Dorbest* and *Shandong* decisions was to fundamentally undermine this favored approach.  As such, the single country approach adopted by the Department and applied in AR5 was a legitimate change in policy, motivated by court decisions finding fault with Commerce's prior methodologies.

## II.   COMMERCE HAS FULLY EXPLAINED THE DEPARTURE FROM ITS PRIOR LABOR POLICY

In its comments, AHSTAC claims that Commerce has still not adequately explained its departure from prior findings that, unlike other factors of production ("FOPs"), the labor FOP justified a multi-country surrogate valuation methodology.  AHSTAC is wrong.

In its Remand Results, Commerce explains in detail what lead to its change in policy and why its new single-country policy is reasonable, including as applied to the review in question here.  AHSTAC says that the Remand Results are "devoid of any attempt to explain why Commerce's prior factual findings are no longer persuasive."  AHSTAC is not reading very carefully.  Commerce agrees with AHSTAC that its prior factual findings remain persuasive; the problem is that the court decisions in *Dorbest IV* and *Shandong* forced Commerce to reconsider its policy.  Specifically, the Court of Appeals for the Federal Circuit invalidated the Department's multi-country regression regulation concerning surrogate labor values because it permitted data from "economically dissimilar" countries to be used in calculating labor values.  *Dorbest IV*, 604 F.3d at 1372.  Further, the Court of International Trade held the Department's interpretation that any country exporting comparable merchandise is a "significant producer" under 19 U.S.C. § 1677b(c)(4) was unlawful.  *See Shandong*, 774 F. Supp. 2d at 1315.  These decisions curtailed the number of countries from which the Department could choose when calculating average labor rates.  *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Dep't Commerce June 21, 2011).

Because the number of countries available for use as surrogate labor rate sources diminished so greatly as a result of these decisions, Commerce reasonably concluded that "an averaging methodology with limited data points that cannot adequately account for the existence of the correlation between wage rates and GNI and the variation among wage rates of economically comparable economies is inferior to relying upon the primary surrogate country." Remand Results at 7.

Commerce further explained, in response to AHSTAC's comments made before the agency, that it had already become difficult to achieve the goal of its original multi-country methodology after *Dorbest IV* – that is, it discovered that the original intent of providing a predictable methodology, particularly across cases, was fundamentally undermined by the reduction in countries that were part of Commerce's original multi-country regression analysis. Remand Results at 11. This was because the universe of averaged labor data was no longer constant, and therefore would change across products and from one segment of a proceeding to the next. *Id.* The drawbacks in the new non-regression multi-country approach that it was encountering in the aftermath of *Dorbest IV* were further exacerbated when the court in *Shandong* limited further still the pool of countries from which Commerce could choose to value labor. *Id.*

AHSTAC belittles the difficulty Commerce faced in the aftermath of *Dorbest IV* and *Shandong* by suggesting that Commerce resorted to a single-country methodology out of "administrative convenience." The "difficulty" Commerce faced was not merely administrative in nature; it was mathematical. The entire purpose of the original regression model that Commerce had used for so long – that is, to smooth out the variability in labor rates that exists for reasons other than economic development levels – was gutted by the *Dorbest IV* and *Shandong* decisions. Because the goal of Commerce's original multi-country approach could no longer be achieved, the agency reasonably

considered whether a single-country approach was a more appropriate method for valuing labor. It ultimately concluded that the single country approach was, in fact, more appropriate. Without being able to eliminate variability in labor rates among a large pool of countries, labor became no different from any other FOP. The standard policy of preferring data from the primary surrogate country became equally applicable to labor as it was to other FOPs.

AHSTAC's comments effectively ignore the impact of *Dorbest IV* and *Shandong*. A simple statement in *Shandong* that Commerce may continue to use a multi-country approach does not deem such an approach the best information available. Commerce reasonably considered whether the effect of both *Dorbest IV* and *Shandong* was to gut the original intent of the multi-country approach, and concluded reasonably that it did.

This was certainly a legitimate conclusion in the administrative review at issue here. The only other country whose data could be used was the Philippines. Having data from two countries did not come close to achieving the goals Commerce achieved with the regression model. The only rationale for AHSTAC's suggestion that Commerce average the Bangladeshi and Filipino labor rates is that it derives a higher surrogate labor rate. This cannot be a sufficient reason to use a multi-country methodology.

Yet, even AHSTAC would have to admit that averaging data from Bangladesh and the Philippines suffers from a separate problem – the fact that these two countries' labor data were based on completely different groups of laborers. As discussed below, this easily justified the application of a single-country approach to valuing labor in this case.

### III. COMMERCE HAS FULLY RECONCILED ITS CHOICE OF BANGLADESH WITH THE RECORD EVIDENCE

AHSTAC suggests that Commerce could have averaged the Bangladeshi and Filipino rates, notwithstanding the fact that the rates were from different sources (BBS versus ILO) and represented

different categories of laborers (shrimp processing versus food and beverage processing). AHSTAC should know better. Averaging two numbers that represent different concepts is inherently flawed. It is a classic example of comparing apples and oranges. We might as well ignore product characteristics, and start comparing U8 count-size shrimp prices with 41-50 prices. Indeed, let's combine the shrimp and fish cases and compare shrimp prices to fish prices. Averaging values that have a different basis is mathematically unsound. Commerce was justified in concluding that this approach was unreasonable from a pure math perspective.

Wisely, Commerce also explained that the difference in labor rates – which obviously drove AHSTAC's desire to average them – could not necessarily be attributed to a variation in labor in the two markets, but could simply be due to the difference in the labor rates paid to the two different industries that the two numbers represented.

AHSTAC somehow thinks that industry specificity is what drove Commerce's decision in this case. This is a straw man. Bangladesh was the primary surrogate country. The BBS data was the labor rate data on the record from that country. Based on the new single-country labor rate policy, the BBS data was the only data that could be used, unless Commerce could justify averaging that data with data from other countries, which as discussed above it determined it should not do (given only one other country) and could not do (given the difference bases for the labor rate data).

AHSTAC reverts back to the argument that Commerce rejected the BBS data in the prior review as being "unreliable and arbitrary". Yet, AHSTAC keeps forgetting that the context in which the BBS rate was rejected in AR4 was when Commerce was using a multi-country labor rate methodology. Since that review, Commerce was forced by court decision to alter its policy, leading to the single-country approach discussed above. In this paradigm, the BBS data is the best information available.

AHSTAC's argument about the relative GNI of Bangladesh and the Philippines reflects a complaint about surrogate country selection, not labor. But the fact that there tends to be a correlation between GNI and labor rates is immaterial. Indeed, such an observation is a tautology. This doesn't make a country's labor rate more or less legitimate. It simply supports the legitimacy of Commerce's prior multi-country labor rate methodology. The problem is that the Court of Appeals and the Court of International Trade have effectively undermined the utility of the multi-country approach, leading Commerce to reasonably conclude that a single country labor rate was more appropriate. The fact that Bangladesh was deemed the primary surrogate country – for a whole host of reasons having nothing to do with its relative GNI as compared with other possible surrogate countries – makes its published labor rates the preferred source to value the labor FOP.

Ultimately, however, what matters is not whether the Court agrees that the Bangladeshi BBS labor rate is the preferred or not. What matters is whether Commerce has explained sufficiently why its conclusion reflects a reasonable interpretation of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Commerce has easily met this standard.

## IV. AHSTAC HAS NOT PROVEN THAT COMMERCE'S CHOSEN BANGLADESH LABOR RATE IS ABERRATIONAL

AHSTAC's argument that the Bangladeshi BBS labor rate is aberrational is no different from the argument it presented before Commerce and before the Court previously. The Court did not ultimately find this aspect of AHSTAC's argument compelling. The fact that the Bangladeshi rate is lower than the other sources does not prove that it is aberrational; it merely proves that it is lower. From the perspective of a petitioner, this may seem unfair, but it does not make Commerce's choice of it legal error.

AHSTAC says that the $0.21 rate is dramatically different from other rates on the record. Yet, judging from the other rates, several of them would also be deemed aberrational. At $0.21, the Bangladeshi rate is about 50% below the next lowest rate, which is the Indonesian rate of $0.41. Put differently, the Indonesian rate is nearly twice as high as the Bangladeshi rate. But the range of rates AHSTAC apparently views as non-aberrational is from $0.41 to $2.41. In other words, though it views a Bangladeshi rate that is half the size of the Indonesian rate to be aberrational, it considers rates that are twice, three times, four times, five times, and even almost six times bigger than Indonesia's rate to be perfectly legitimate. What sense does this make? Even if AHSTAC is right that comparisons of data across countries is a fair way of determining whether a value is aberrational, that analysis does not lead to the conclusion it seeks here.

## V.    CONCLUSION

Respondents respectfully request this Court to uphold the use of Bangladesh BBS labor rate for shrimp production to calculate surrogate labor values for shrimp from Vietnam.

Respectfully submitted,

/s/  Matthew R. Nicely
Matthew R. Nicely
**Hughes Hubbard & Reed LLP**
1775 I Street, NW
Washington, DC 20006
(202) 721-4750
(202) 729-4750 (fax)
nicely@hugheshubbard.com

*Counsel to Minh Phu Seafood Corporation*

Date: July 18, 2013

**CERTIFICATE OF SERVICE**
**CAMAU FROZEN SEAFOOD PROCESSING IMPORT EXPORT**
**CORPORATION, ET AL. v. UNITED STATES**
**COURT NO. 11-00399**

      I, Matthew R. Nicely, hereby certify that a copy of the foregoing submission was served on this 18th day of July 2013, by electronic service through the CM/ECF system on the following parties the following parties:

On Behalf of the United States:
Joshua E. Kurland
**U.S. DEPARTMENT OF JUSTICE**
PO Box 480
Ben Franklin Station
Washington, DC 20044

On Behalf of Ad Hoc Shrimp Trade Action Committee:
Nathaniel Jude Maandig Rickard
**PICARD, KENTZ & ROWE LLP**
1750 K Street, NW
Suite 1200
Washington, DC 20006

On Behalf of American Shrimp Processors Association:
Elizabeth Jackson Drake
**STEWART AND STEWART**
2100 M Street, NW
Suite 200
Washington, DC 20037

                                                                                    /s/ Matthew R. Nicely
                                                                                     Matthew R. Nicely
                                                                                     **Hughes Hubbard & Reed LLP**
                                                                                     1775 I Street, NW
                                                                                     Washington, DC 20006
                                                                                     (202) 721-4750
                                                                                     (202) 729-4750 (fax)
                                                                                     nicely@hugheshubbard.com

                                                                                     *Counsel to Minh Phu Seafood Corporation*