Slip Op. 13 - 95

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CAMAU FROZEN SEAFOOD PROCESSING IMPORT EXPORT CORPORATION, *et al.*,<br><br>          Plaintiffs,<br><br>          v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>          and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>          Defendant-Intervenors. | Before: Donald C. Pogue,<br>          Chief Judge<br><br>Consol. Court No. 11-00399[1] |

**OPINION**

[remanding the <u>Final Results of Redetermination Pursuant to Court Remand</u> for further explanation or reconsideration]

Dated: July 31, 2013

<u>Matthew R. Nicely</u>, Hughes Hubbard & Reed LLP, of Washington, DC, on behalf of Plaintiffs Camau Frozen Seafood Processing Import Export Corp.; Minh Phu Seafood Corp.; Minh Phat Seafood Co., Ltd.; Minh Qui Seafood Co., Ltd.; and Viet I-Mei Frozen Foods Co., Ltd.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, on behalf of Defendant.  With him on the brief were <u>Stuart F. Delery</u>, Principal Deputy Assistant Attorney

---

[1] This action is consolidated with court no. 11-00383. Order, Dec. 20, 2011, ECF No. 30.

General; Jeanne E. Davidson, Director; and Patricia M. McCarthy, Assistant Director.  Of counsel on the briefs was Mykhalo A. Gryzlov, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Andrew W. Kentz, Jordan C. Kahn, Nathaniel M. Rickard, and Nathan W. Cunningham, Picard Kentz & Rowe LLP, of Washington, DC, for the Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

Terence P. Stewart, Geert M. De Prest, and Elizabeth J. Drake, Stewart and Stewart, of Washington, DC, and Edward T. Hayes, Leake & Andersson, LLP, of New Orleans, LA, for the Defendant-Intervenor American Shrimp Processors Association.

**Pogue, Judge:**  This case returns to court following remand by Camau Frozen Seafood Processing Import Export Corp. v. United States, __ CIT __, 880 F. Supp. 2d 1348 (2012) ("Camau I").  Camau I reviewed challenges to the final results of the fifth administrative review ("AR") of the antidumping duty order covering certain frozen warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam").[2]  Id. at 1351.  Specifically, Camau I rejected a facial challenge to Commerce's use, in the fifth AR, of its New Labor Methodology,[3] but remanded the Final

---

[2] Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 76 Fed. Reg. 56,158 (Dep't Commerce Sept. 12, 2011) (final results and final partial rescission of antidumping duty administrative review) ("Final Results") and accompanying Issues & Decision Memorandum, A-552-802, ARP 09-10 (Aug. 31, 2011) ("I & D Mem.").

[3] Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) ("New Labor Methodology").

(footnote continued)

Results for Commerce to further explain or reconsider its
determination to value labor solely on the basis of data from
the Bangladesh Bureau of Statistics ("BBS") in light of
Commerce's prior surrogate labor policy and the apparent
discrepancy between the Bangladeshi labor data and the
Philippine labor data on the record. Id. at 1358-61.  In the
Final Results of Redetermination Pursuant to Court Remand,
A-552-802, ARP 09-10 (Apr. 12, 2013), ECF No. 90 ("Remand
Results"), Commerce determined that it would continue to value
labor solely on the basis of the BBS data.

        For the reasons that follow, the court will order a
second remand for Commerce to further explain or reconsider its
determination to value labor in this case solely on the basis of
the BBS data.

        The court has jurisdiction pursuant to
§ 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended,
19 U.S.C. § 1516a(a)(2)(B)(iii) (2006)[4] and 28 U.S.C. § 1581(c)
(2006).

_____

        [4] All further citations to the Tariff Act of 1930, as
amended, are to Title 19 of the U.S. Code, 2006 edition, unless
otherwise noted.

## STANDARD OF REVIEW

"The court will sustain the Department's determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." Jinan Yipin Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

## DISCUSSION[5]

Prior to adoption of the New Labor Methodology, Commerce used multi-country averaging to value labor because "wage data from a single surrogate country does not constitute the best available information for purposes of valuing the labor input due to the variability that exists between wages and GNI. . . . As a result, we find reliance on wage data from a single surrogate country to be unreliable and arbitrary."[6]  When Commerce adopted the New Labor Methodology, it did not repudiate

---

[5] The facts of this case were summarized in the court's prior opinion. Camau I, __ CIT at __, 880 F. Supp. 2d at 1351–53, 1357–58.  Familiarity with Camau I is presumed, and only those facts necessary to the disposition are reiterated here.

[6] Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, Issues and Decision Mem., A-552-802, ARP 08-09 (July 30, 2010) (adopted in 75 Fed. Reg. 47,771, 47,772 (Dep't Commerce Aug. 9, 2010) (final results and  partial rescission of antidumping duty administrative review)) ("AR 4 I & D Mem."), cmt. 9 at 27.

this reasoning.  Rather, Commerce acknowledged in the New Labor
Methodology that "[d]ue to the variability in wage rates among
economically comparable [market economy countries], the
Department has tried to include wage data from as many countries
as possible that were also economically comparable to the [non-
market economy country ("NME")] and significant producers of
comparable merchandise . . . ." New Labor Methodology, 76 Fed.
Reg. at 36,093; see also Camau I, 880 F. Supp. 2d at 1358-59.
But, based on its experience in light of Dorbest Ltd. v. United
States, 604 F.3d 1363 (Fed. Cir. 2010) ("Dorbest IV") and
Shandong Rongxin Import & Export Co. v. United States, __ CIT
__, 774 F. Supp. 2d 1307 (2011),[7] Commerce concluded that "the
base for an average wage calculation would be so limited that
there would be little, if any, benefit to relying on an average
of wages from multiple countries for purposes of minimizing the
variability that occurs in wages across countries." New Labor

---

[7] Dorbest IV invalidated the regulation, 19 C.F.R.
§ 351.408(c)(3), that Commerce relied upon to value labor using
a multi-country regression analysis, holding that the regulation
"improperly require[d] using data from both economically
comparable and economically dissimilar countries, and it
improperly use[d] data from both countries that produce
comparable merchandise and countries that do not." Dorbest IV,
604 F.3d at 1372.  Shandong Rongxin, held that Commerce was
including countries in the surrogate labor average that produced
little or no comparable merchandise in contravention of the
statutory requirement that a surrogate country be a significant
producer of comparable merchandise. Shandong Rongxin, __ CIT
at __, 774 F. Supp. 2d at 1316.

Methodology, 76 Fed. Reg. at 36,093.  Camau I held this to be a

reasonable basis for Commerce's change in policy, 880 F. Supp.

2d at 1358; therefore, the decision to change the labor

valuation policy is not before the court on review of the Remand

Results.  Nonetheless, insofar as Commerce maintains that (1)

valuing labor based on a single surrogate country may be

distortive given the variability in wage rates among countries

that Commerce considers to be economically comparable and (2)

the variability in wage rates corresponds to variability in GNI,

the record in this case presents the possibility of just such a

distortion.

        As noted in Camau I, Commerce considered two wage rate

values in the Final Results: one from Bangladesh, based on the

BBS data, and one from the Philippines, based on Chapter 5B of

the International Labor Organization Yearbook of Labour

Statistics ("ILO Chapter 5B").  Id. at 1359-60 & n.12.  The wage

rate value for the Philippines is several orders of magnitude

larger than the wage rate value for Bangladesh.  See Id. at 1360

(comparing GNI and wage rates of the Philippines and

Bangladesh).  In light of Commerce's prior policy and findings,

it comes as no surprise that the Philippine GNI is also several

times larger than the Bangladeshi GNI.  Id.  On these facts,

Commerce's non-repudiated prior reasoning suggests that a single surrogate country value for labor could introduce distortion.[8] While an averaging system that eliminates such distortion may not be possible, that fact alone is not a reasoned explanation for Commerce's choice between the two datasets.  Therefore, Camau I remanded this issue for an explanation of why, in light of Commerce's prior reasoning and the record evidence in this case, valuing labor solely on the basis of the BBS data was reasonable and the best available information.  Id.

        Commerce justifies its decision in the Remand Results by invoking its policy of valuing all surrogate values from a single surrogate country when possible.  Remand Results at 7–8. Commerce contends that using a single surrogate country to value all FOPs "better reflects the trade-off between labor costs and other factors' costs, including capital, based on their relative prices."  Id. at 8.  This is the only affirmative basis Commerce offers to support its choice of the Bangladeshi data.  Thus, Commerce argues that its policy of favoring a single surrogate country to value all FOPs, and the reasoning supporting that

_____

        [8] The court makes no judgment regarding which dataset is the best available information.  That decision is reserved to Commerce so long as it supports its determination with a reasoned explanation. Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

policy, is sufficient to value labor solely on the basis of the
BBS data in this case.

        This basis alone, however, is not sufficient to
address the remand order in Camau I.  Commerce's policy of
valuing all factors of production from a single surrogate
country when possible, see 19 C.F.R. § 351.408(c)(2) (2011), may
be reasonable because, among other reasons, it reduces surrogate
value distortions introduced by out-of-market prices, see
Clearon Corp. v. United States, Slip Op. 13-22, 2013 WL 646390,
at *6 (CIT Feb. 20, 2013); nonetheless, Commerce has the
statutory authority to use multiple surrogate countries, 19
U.S.C. § 1677b(c)(1), and has invoked that authority when it
deemed such to be appropriate – specifically as part of its
prior labor valuation methodology, see, e.g., Grobest & I-Mei
Indus. (Viet.) Co. v. United States, __ CIT __, 815 F. Supp. 2d
1342, 1356-60 (2012) (affirming Commerce's decision to use
multi-country averaging for surrogate labor valuation); Peer
Bearing Co.-Changshan v. United States, __ CIT __, 804 F. Supp.
2d 1337, 1353 (2011) (noting Commerce's use of Indian and Thai
data for different surrogate values in the same review).
Therefore, it is not sufficient for Commerce to cite the policy
of using a single surrogate country where, as here, there is
reason to believe that the primary surrogate country may not
provide the best available information for a particular FOP.

Case law repeatedly emphasizes that "use of a single
surrogate country is justified when . . . all other factors are
fairly equal . . . ." Clearon Corp., 2013 WL 646390, at *6
(internal quotation marks omitted); Peer Bearing, __ CIT at __,
804 F. Supp. 2d at 1353 ("[T]he preference for use of data from
a single surrogate country could support a choice of data as the
best available information where the other available data 'upon
a fair comparison, are otherwise seen to be fairly equal . . .
.'") (quoting Peer Bearing Co.-Changshan v. United States, __
CIT __, 752 F. Supp. 2d 1353, 1373 (2011)) (second alteration in
original).  In light of Commerce's prior reasoning with regard
to labor values, however, the evidence on the record in this
case cannot, without more, be considered fairly equal.[9]  Thus,

---

[9] Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee
("AHSTAC") also argues that the BBS is not fairly equal because
the labor rate drawn from the BBS data, $0.21 USD/hour, is
aberrational. Ad Hoc Shrimp Trade Action Comm.'s Comments on
Final Results of Redetermination Pursuant to Court Remand, ECF
No. 94 ("AHSTAC's Comments") at 22-28.  AHSTAC's claim of
aberration is premised on the Bangladeshi labor rate being the
lowest on the record.  AHSTAC cites Xinjiamei Furniture
(Zhangzhou) Co. v. United States, Slip Op. 13-30, 2013 WL 920276
(CIT Mar. 11, 2013), and Mittal Steel Galati S.A. v. United
States, 31 CIT 1121, 502 F. Supp. 2d 1295 (2007), in support of
its argument that data can be found aberrational by comparison
to other data on the record. AHSTAC's Comments at 22-25.  But
Xinjiamei Furniture and Mittal Steel are distinguishable from
this case.  It is true that both cases found aberrational a
surrogate value chosen by Commerce that was significantly
different from other values on the record; however, both cases
also found that the source of the aberrational surrogate value

(footnote continued)

because there is reason to doubt the primary surrogate country

value, Commerce must address the conflicting evidence on the

record that may counsel against the policy of valuing all FOPs

from the primary surrogate country.  Not addressing the

conflicting evidence on the record, as noted in <u>Camau I</u>, fails

the substantial evidence test because it does not take into

account record evidence contrary to Commerce's determination.

See <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951).

---

was of such a low volume that its reliability was questionable.
See <u>Xinjiamei Furniture</u>, 2013 WL 920276, at *5 ("[T]he evidence
produced by plaintiff is sufficient to cause any reasonable mind
to seek some explanation as to how such a small sample could be
non-distortive and potentially the best available information.")
(internal quotation marks omitted); <u>Mittal Steel</u>, 31 CIT at
1135, 502 F. Supp. 2d at 1307–08 ("The court remands this issue
to Commerce for further explanation in light of the data placed
on the record that demonstrates that the limestone value that
Commerce selected was much higher than the value of limestone
imported in other countries and applied to a small volume of
imports.").  In this case, AHSTAC does not offer any basis for
finding the Bangladeshi labor values aberrational beyond the
fact that the Bangladeshi values are the lowest on the record.
Furthermore, unlike <u>Xinjiamei Furniture</u> and <u>Mittal Steel</u>, the
Bangladeshi labor values are not significantly different from
most or all of the other values on the record.  Rather, the
prices that AHSTAC offers for comparison form a nearly straight
line continuum from the Bangladeshi data on the low end to the
Philippine ILO Chapter 6A data on the high end. AHSTAC's
Comments at 22 (comparing the following values: $0.21 (BBS);
$0.41 (Indonesia ILO Chapter 5B); $0.70 (India ILO Chapter 6A);
$0.82 (Guyana ILO Chapter 6A); $1.02 (Nicaragua ILO Chapter 6A);
$1.91 (Philippines ILO Chapter 5B); $2.41 (Philippines ILO
Chapter 6A).  On this record, the Bangladeshi data is not
aberrational, it is merely the lowest price in a range of
prices.

Commerce has not, however, addressed the conflicting evidence on the record in the Remand Results.[10]  While "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being support by substantial evidence," Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966), Commerce must, nonetheless, provide a reasonable basis for its determination, see Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351-52 (Fed. Cir. 2006); Amanda Foods (Viet.) Ltd. v. United States, __ CIT __, 647 F. Supp. 2d 1368, 1378-79 (2009).  Instead, Commerce argues that the Bangladeshi data and the Philippine data are collected at different levels of aggregation; therefore, Commerce asserts that the two data sets are not comparable and a disparity in wage rates cannot be deduced from the data. Remand Results at 8-9.  Commerce's argument is unpersuasive.

First, Commerce provides no explanation for why the different levels of aggregation render the data incomparable.

_____

[10] AHSTAC contends that Commerce also improperly ignored other available data on the record, including ILO Chapter 6A data for the Philippines, Guyana, Nicaragua, and India. AHSTAC Comments at 19-21.  The court recognizes that this evidence is on the record for Commerce's consideration, but, as in Camau I, the court makes no determination regarding the role this evidence would play in an ultimately reasonable determination by Commerce regarding the surrogate value for labor.  Whether this evidence is useful in reaching a reasonable determination is for Commerce to decide in the first instance. See Zhejiang DunAn Hetian, 652 F.3d at 1341.

Different levels of aggregation alone do not, necessarily, prevent two datasets from being compared. What is of consequence is the particular factors that make the datasets similar enough to compare or too different to compare – for example, the relative levels of aggregation, the relationship between the levels of aggregation, and the purpose of the comparison. In short, Commerce must provide some reason to justify its determination that the datasets are too different to compare, see Amanda Foods, __ CIT at __, 647 F. Supp. 2d at 1378–79, and level of aggregation is a description not a reason.

Second, Commerce's treatment of the ILO data in other circumstances suggests that it may, in fact, be comparable with the BBS data. It is Commerce's default policy to use ILO data when valuing labor.[11] Commerce considers data reported at an International Standard Industrial Classification ("ISIC") level representative of the industry in question to be industry specific. See New Labor Methodology, 76 Fed. Reg. at 36,094 & nn. 10, 11; Surrogate Values for the Preliminary Results, A-552-802, APR 09-10 (Feb. 28, 2011), Admin. R. Pt. 1 Pub. Doc.

---

[11] Commerce's preference, as expressed in the New Labor Methodology, is to use ILO Chapter 6A data. New Labor Methodology, 76 Fed. Reg. at 36,093. Prior to the New Labor Methodology Commerce used ILO Chapter 5B data. Id.; see also I & D Mem., cmt. 2.I at 22-23.

144 ("Surrogate Value Mem.") at 7.  Prior to adopting the

standards from the New Labor Methodology in this case, Commerce

determined that ISIC-Revision 3, sub-classification 15,

described as "manufacture of food products and beverages," was

industry specific because it included "processing and

preservation of fish and fishery products." Id.  The fact that

Commerce considers the ILO data to be industry specific and

would otherwise employ the ILO data but for the particular facts

of this case – i.e., no ILO data for Bangladesh and an

alternative industry-specific dataset – suggests that the ILO

data and the BBS are comparable despite the different levels of

aggregation.  That is, the data sets are a least comparable

enough in Commerce's view for them to be theoretically

interchangeable for the purpose of valuing labor.[12]

     Thus, Commerce's reasoning in the Remand Results

remains an insufficient explanation, and the court remains

unable to affirm Commerce's determination in the Final Results.

Commerce's policy of valuing all surrogate values on the basis

of the primary surrogate country is a reasonable choice insofar

as there is no reason to believe that a value from the primary

---

     [12] Arguably, the dataset comparability is more than
theoretical given that Commerce chose to value labor in the
fourth administrative review using ILO Chapter 5B data, AR 4
I & D Mem., cmt. 9 at 30, while using the BBS data in this, the
subsequent, review.

surrogate country would be distortive or inaccurate.  Record
evidence in this case continues to raise such a possibility, and
Commerce has not addressed that evidence in the <u>Remand Results</u>.
Furthermore, Commerce's attempt to avoid the troubling
disparities between the surrogate values for labor by suggesting
that the datasets are not comparable is unpersuasive.  Commerce
provides no justification for its conclusion of incomparability
other than the different levels of aggregation – a distinction
that, absent further explanation, is not a meaningful
difference.


**CONCLUSION**

In light of the foregoing, the <u>Final Results</u> are again
remanded to Commerce for further explanation or reconsideration
of the surrogate value for labor consistent with this opinion
and <u>Camau I</u>.  Commerce shall have until September 30, 2013, to
complete and file its remand redetermination.  Plaintiffs and
Defendant-Intervenors shall have until October 15, 2013, to file
comments.  Plaintiffs, Defendant, and Defendant-Intervenors
shall have until October 29, 2013, to file any reply.

It is **SO ORDERED.**

/s/ Donald C. Pogue
Donald C. Pogue, Chief Judge

Dated: July 31, 2013
      New York, NY